IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

SPANGLER CANDY COMPANY

    Plaintiff,

v.

TOOTSIE ROLL INDUSTRIES, LLC

    Defendant.

Civil Action No.  3:18-cv-1146

Judge Helmick

**[REDACTED]**


**DEFENDANT TOOTSIE ROLL INDUSTRIES, LLC'S OPPOSITION TO PLAINTIFF
SPANGLER CANDY COMPANY'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

CONCISE STATEMENT OF ISSUES PRESENTED AND INTRODUCTION........................ 1

SUMMARY OF THE ARGUMENT AND LAW................................................................ 2

I.   BACKGROUND ................................................................................................ 4

   A.   Defendant Tootsie Roll Industries, LLC ...................................................... 4

      1.   Corporate History.................................................................................4

      2.   The CHARMS MINI POPS Packaging ........................................................4

   B.   Plaintiff Spangler Candy Company and Its Purported Trade Dress................................. 7

II.  ARGUMENT ...................................................................................................... 8

   A.   Spangler Cannot Demonstrate A Likelihood Of Success On The Merits. ...................... 9

      1.   Spangler's Purported Trade Dress Is Not Protectable. ................................9

         a.   Spangler's Purported Trade Dress Is Primarily Functional............................10

         b.   Spangler's Purported Trade Dress Is Not Inherently Distinctive....................12

         c.   Spangler Failed To Establish Secondary Meaning............................................13

      2.   There Is No Likelihood Of Confusion Between The Parties' Packaging. ................16

         a.   The Parties' Packaging Are Dissimilar. .........................................17

         b.   Spangler's Purported Trade Dress Is Exceedingly Weak In the Candy Market. ................................................................................19

         c.   There Is No Evidence Of Actual Confusion As To The Source Of The Parties' Products.................................................................21

            (1)   Spangler's Keegan Survey Proves Nothing. ...........................................21

            (2)   The Butler Survey Shows Minus 1.0% Likely Confusion. .......................22

            (3)   The Sowers Survey Shows 0.2% Likely Confusion................................23

         d.   Tootsie Had No Intent To Deceive Or Confuse Consumers When It Adopted The Accused Packaging....................................................24

         e.   Likely Degree Of Purchaser Care .....................................................25

   B.   Spangler Failed to Demonstrate Irreparable Harm.........................................26

   C.   The Balance of Hardships Favors Tootsie. ..............................................28

   D.   Denial Of Spangler's Motion Is In The Public Interest....................................29

III. CONCLUSION..................................................................................................30

**CASES**

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*,
280 F.3d 619 (6th Cir. 2002) ........................................................................ passim

*Abney v. Amegen, Inc.*,
443 F.3d 540 (6th Cir. 2006) ................................................................................. 26

*Antioch Co. v. Western Trimming Corp.*,
347 F.3d 150 (6th Cir. 2003) ................................................................................. 17

*AutoZone, Inc. v. Tandy Corp.*,
373 F.3d 786 (6th Cir. 2004) ................................................................................. 24

*Big Time Worldwide Concert & Sport Club at Town Ctr., LLC. v. Marriott Int'l, Inc.*,
236 F. Supp. 2d 791 (E.D. Mich. 2003) ................................................................ 20

*Blockbuster v. Laylco, Inc.*,
869 F. Supp. 505 (E.D. Mich. 1994) ...................................................................... 28

*Bonnell v. Lorenzo*,
241 F.3d 800 (6th Cir. 2001) ............................................................................. 2, 3

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
973 F.2d 1033 (2d Cir. 1992) ................................................................................. 17

*Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*,
No. 10 CV 2333 KMW, 2013 WL 822173 (S.D.N.Y Mar. 6, 2013) ..................... 21

*Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*,
871 F.2d 590 (6th Cir. 1989) ................................................................................. 13

*BuzzBallz, LLC v. JEM Bev. Co.*,
No. 3:15-CV-588-L, 2015 WL 3948757 (N.D. Tex. June 26, 2015) ..................... 28

*Cairns v. Franklin Mint Co.*,
24 F. Supp. 2d 1013 (C.D. Cal. 1998) ................................................................... 21

*Chrysler Grp. LLC v. Moda Grp. LLC*,
796 F. Supp. 2d 866 (E.D. Mich. 2011) ................................................................ 13

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985) ................................................................................... 28

*Deck v. City of Toledo*,
29 F. Supp. 2d 431 (N.D. Ohio 1998) .................................................................. 3, 8

*E & J Gallo v. Proximo Spirits, Inc.*,
No. CV-F-10-411 LJO JLT, 2012 WL 273076 (E.D. Cal. Jan. 30, 2012) .............................. 21

*Ferrari S.P.A. v. Roberts*,
944 F.2d 1235 (6th Cir. 1991) ............................................................................ 13

*First Nat'l Bank in Sioux Falls v. First Nat'l Bank So. Dakota*,
679 F.3d 763 (8th Cir. 2012) ............................................................................ 22

*Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*,
626 F.2d 193 (1st Cir. 1980) ............................................................................. 17

*Friendship Materials, Inc. v. Mich. Brick, Inc.*,
679 F.2d 100 (6th Cir. 1982) ............................................................................ 28

*Frisch's Rest., Inc. v. Shoney's, Inc.*,
759 F.2d 1261 (6th Cir. 1985) .................................................................... passim

*Garlock, Inc., v. United Seal, Inc.*,
404 F.2d 256 (6th Cir. 1968) ........................................................................ 3, 8

*Gen. Motors Corp. v. Lanard Toys, Inc.*,
468 F.3d 405 (6th Cir. 2006) ............................................................................ 10

*Gray v. Meijer, Inc.*,
295 F.3d 641 (6th Cir. 2002) ..................................................................... passim

*Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l., Inc.*,
730 F.3d 494 (6th Cir. 2013) ..................................................... 9, 17, 24, 25

*Hansen Beverage Co. v. Cytosport, Inc.*,
No. CV 09-0031-VBF AGRx, 2009 WL 5104260 (C.D. Cal. Nov. 4, 2009) ........................ 21

*Herman Miller, Inc. v. Palazzetti Imp. & Exp., Inc.*,
270 F.3d 298 (6th Cir. 2001) ............................................................................ 13

*Homeowners Group, Inc. v. Home Mktg. Specialists*,
931 F.2d 1100 (6th Cir. 1991) .................................................................... 19, 20

*In re DeLorean Motors*,
755 F.2d 1223 (6th Cir. 1985) ........................................................................... 28

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
456 U.S. 844 (1982) ........................................................................................ 10

*Leary v. Daeschner*,
228 F.3d 729 (6th Cir. 2000) ........................................................................ 3, 8

*Litton Sys., Inc. v. Whirlpool Corp.*,
    728 F.2d 1423 (Fed. Cir. 1984) ..................................................................... 11, 18

*Malaco Leaf, AB v. Promotion in Motion, Inc.*,
    287 F. Supp. 2d 355 (S.D.N.Y. 2003) ................................................................. 21

*McDonald's Corp. v. Burger King Corp.*,
    87 F. Supp. 2d 722 (E.D. Mich. 1999).................................................................. 28

*Mini Melts, Inc. v. Reckitt Benckiser LLC*,
    118 U.S.P.Q.2d 1464, 2016 WL 3915987 (T.T.A.B. 2016).................................... 21

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*,
    305 F.3d 566 (6th Cir. 2002) ............................................................................... 27

*Pals Grp. v. Quiskeya Trading Corp.*,
    No. 16-23905-CIV-Goodman, 2017 WL 532299 (S.D. Fla. Feb. 9, 2017)............. 28

*Parks LLC v. Tyson Foods, Inc.*,
    863 F.3d 220 (3d Cir. 2017) ................................................................................. 14

*PGP, LLC v. TPII, LLC*,
    734 F. App'x 330 (6th Cir. 2018) ......................................................................... 27

*Qualitex Co. v. Jacobson Prods. Co.*,
    514 U.S. 159 (1995)........................................................................................ 10, 12

*Quia Corp. v. Mattel, Inc.*,
    No. C 10-1902 JF HRL, 2010 WL 2486364 (N.D. Cal. June 15, 2010) ................ 21

*R.F.M.A.S., Inc. v. So*,
    619 F. Supp. 2d 39 (S.D.N.Y. 2009)..................................................................... 16

*Real-Time Reporters, P.C. v. Sonntag Reporting Servs.*,
    No. 13 C 5348, 2013 WL 5818460 (N.D. Ill. Oct. 29, 2013).................................. 28

*Reuters, Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990) ................................................................................. 26

*Syndicate Sale, Inc. v. Hampshire Paper Corp.*,
    192 F.3d 633 (7th Cir. 1999) ................................................................................ 17

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
    532 U.S. 23 (2001).................................................................................... 10, 13, 30

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992)........................................................................................... 9, 12

*Venn v. Goedert*,
  319 F.2d 812 (8th Cir. 1963) ........................................................................... 11, 18

*Vita-Mix Corp. v. Tristar Prods., Inc.*,
  No. 1:07 CV 275, 2008 WL 11383504 (N.D. Ohio Sept. 30, 2008) ....................................... 27

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
  529 U.S. 205 (2000) ........................................................................... 9, 12, 13

*Ward v. Knox Cty. Bd. of Educ.*,
  612 F. App'x 269 (6th Cir. 2015) ...................................................................... 14, 15

*Wells Fargo v. WhenU.com, Inc.*,
  293 F. Supp. 2d 734 (E.D. Mich. 2003) ................................................................... 26

*Wreal, LLC v. Amazon.com, Inc.*,
  840 F.3d 1244 (11th Cir. 2016) ........................................................................ 28

## STATUTES

15 U.S.C. § 1125 ........................................................................................ 9, 10

## OTHER

J. Thomas McCarthy,
  *McCarthy on Trademarks and Unfair Competition* (4th ed. 1998) ................................... 20, 27

## RULES

Fed. R. Evid. 702 ....................................................................................... 11

## CONCISE STATEMENT OF ISSUES PRESENTED AND INTRODUCTION

To be entitled to a preliminary injunction, Plaintiff Spangler Candy Company must prove both (1) that it owns protectable rights in its DUM DUMS bag and (2) that Tootsie Roll Industries, LLC's CHARMS MINI POPS bag infringes those rights. Spangler can prove neither.

Spangler's motion for a preliminary injunction boils down to little more than an attempt to prevent fair competition in the candy market. Spangler claims trade dress rights in a few curiously chosen elements of its packaging design, including a red bag, placement of a window to view the product, white lettering, and an oval indicating the number of pops in the bag. But these elements, alone and in combination, are ubiquitous in the candy market:



Spangler presents no probative evidence, only counsel's argument, that this combination of elements is or would be recognized as a source indicator for lollipops.

Even if Spangler could establish protectable trade dress rights, it still cannot show a likelihood of success on the merits as it cannot prove infringement. The prominence of the parties' logos immediately tells the consumer the source of the products, eradicating any possibility of confusion:

 

But it is not necessary to merely guess that consumers will not be confused by the CHARMS MINI POPS bag: two independent survey experts, surveying nearly 800 individuals, and using the predominant *Squirt* and *Eveready* formats, have concluded that there is no likelihood of confusion. And they found not just that there is a likelihood of confusion below some legal threshold: they found *no* confusion in their opinions and surveys. These survey results alone preclude Spangler from proving the likelihood of confusion crucial to its trade dress infringement claim—let alone a "'strong' likelihood of success on the merits" at this preliminary injunction stage.

Finally, even assuming *arguendo* Spangler could establish trade dress rights *and* infringement, a preliminary injunction would still be improper because Spangler made no showing of irreparable harm. Spangler's lengthy delay in seeking injunctive relief alone underscores the lack of irreparable harm. For these reasons, Spangler's motion should be denied.

## SUMMARY OF THE ARGUMENT AND LAW

"A preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *Bonnell v. Lorenzo*, 241 F.3d 800, 808

(6th Cir. 2001). In determining whether this remedy is appropriate, Courts balance four factors: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

In order to prove a "strong" likelihood of success on the merits on its claim, Spangler must first prove by clear and convincing evidence, *Deck v. City of Toledo*, 29 F. Supp. 2d 431, 432 (N.D. Ohio 1998) (citing *Garlock, Inc., v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968)), that it is entitled to trade dress protection by showing that 1) the purported trade dress is primarily nonfunctional and (2) the purported trade dress is distinctive in the marketplace. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (citation omitted). Only then can Spangler attempt to prove that the accused CHARMS MINI POPS packaging is likely to be confused with Spangler's purported trade dress. *Id.*

The likelihood of confusion analysis requires consideration of the eight *Frisch* factors: (1) strength of plaintiff's trade dress; (2) similarity of the trade dress; (3) evidence of actual confusion; (4) defendant's intent in selecting its trade dress; (5) likely degree of purchaser care; (6) relatedness of the goods; (7) marketing channels used; and (8) likelihood of expansion of the product lines. *Gray v. Meijer, Inc.*, 295 F.3d 641, 646 (6th Cir. 2002) (citing *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1266 (6th Cir. 1985)). Here, the dissimilarity of the parties' packaging is determinative: the prominent displays of the parties' respective logos alone render "[Spangler]'s burden of prevailing [based] on the seven other *Frisch's* factors effectively insurmountable." *Abercrombie & Fitch*, 280 F.3d at 647-48.

Because Spangler fails to meet its burden on any of the above elements, Spangler's preliminary injunction motion should be denied.

- 3 -

# I.  BACKGROUND

## A.  Defendant Tootsie Roll Industries, LLC

### 1.  Corporate History

Tootsie was founded in 1896 and has been an innovator since day one. Declaration of Barry Bowen ("Bowen Decl.") ¶ 3. It was then that its chocolaty, hand-rolled candy that did not melt in the heat—the Tootsie Roll—debuted. *Id.* Tootsie has grown to become one of the world's largest confectionery companies, with 2017 revenues of over $500 million. *Id.* ¶ 4. It manufactures and sells some of the world's most popular and well-known confectionery brands, including CHARMS. *Id.*

The Charms Candy Company was founded in 1912. *Id.* ¶ 5. Tootsie purchased it in 1988, making Tootsie the world's largest producer of lollipops. *Id.* Last year Tootsie sold more than ███ in lollipops in the U.S.—nearly ███ of the lollipop market—including almost ███ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████ CHARMS lollipops have been sold for more than 100 years, including products such as CHARMS BLOW POPS and CHARMS MINI POPS. Bowen Decl. ¶ 6. The CHARMS brand is one of Tootsie's most valuable assets. *Id.* ¶ 7.

### 2.  The CHARMS MINI POPS Packaging

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████. As they are attractive, primary colors are commonly used for children's products such as candy. *Id.* With only three primary colors, combinations are limited. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Examples of the old yellow and new red bags are below (*Id.* ¶¶ 20-21):



---

[1] Violators are obtrusive visual elements placed on packaging to disrupt—or violate—the design layout of the package. Bowen Decl. ¶ 19. Violators are effective in announcing, e.g., brand messaging or product features. *Id.*

Tootsie used the elements of the purported trade dress in various CHARMS MINI POPS (and other products) packaging for years before adopting the new red packaging. *Id.* ¶¶ 22-24. For example, the yellow bags included the logo in white letters, a display window in the lower half of the bag, and an oval violator with large numerals inside it located on the lower right-hand side of the bag, covering the window. *Id.* ¶ 22. The CHARMS MINI POPS seasonal bags at right are red, and incorporate the same elements as the yellow bags, except with heart-shaped violators (*Id.* ¶¶ 23-24).





████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████. In view of the overall dissimilarity between the parties' packaging—including their different shades of red, the oversized CHARMS MINI POPS versus DUM DUMS logos, Tootsie's violator being twice the size of Spangler's and shouting "SHOP & COMPARE," and Spangler's blue ribbon with a multicolored dots design and "Drum Man" logo—Tootsie did not believe Spangler would claim the trade dress rights it now asserts and did not believe customers would fail to recognize the differences. *Id.* ¶¶ 26-27.

As to the pallet display, Tootsie has used yellow pallet displays with U-shaped cutouts for years.[2] *Id.* ¶ 28; Ex. A, Vashaw Dep. at 87:9-88:16. The U-shaped design provides strength to allow for stacking of multiple boxes and an opening for product display. Bowen Decl. ¶ 28; Ex. A, Vashaw Dep. at 87:9-24. Tootsie updated the display to feature the CHARMS MINI POPS logo on the front of the box, and retained the U-shaped cutout design, which displays the CHARMS MINI POPS logo on the product packaging. Bowen Decl. ¶ 29.

---

[2] In its argument, Spangler addresses the pallet display only in the context of advertising. D.I. 17-1 at 14. Spangler's trade dress infringement claim thus rises and falls on the accused red CHARMS MINI POPS packaging.

**B.    Plaintiff Spangler Candy Company and Its Purported Trade Dress**

Spangler has sold DUM DUMS lollipops in the current packaging since 2011. D.I. 17-1 at 5. Spangler's purported trade dress is comprised of: (1) a red bag with a brand name in white letters; (2) a display window showing the product, located in the lower half of the bag below the brand name and above a red bottom border of the bag; and (3) a yellow oval located on the lower right-hand side of the bag that covers a portion of the display window and that has large blue numerals inside the yellow oval. D.I. 17-1 at 5; D.I. 1 at 4-5. Spangler owns other federal trade dress registrations, including for the individual wrapping on its lollipops, but not for the purported trade dress in this case. Ex. A, Vashaw Dep. at 91:16-92:3; 92:8-11.

A review of the wide variety of DUM DUMS packaging reveals that the only element of Spangler's purported trade dress Spangler consistently uses across that packaging is the brand name in white letters. Ex. A, Vashaw Dep. at 111:10-121:4, 187:14-188:12, Ex. A-2, Vashaw Dep Ex. 15, Amazon.com: Dum Dums, Ex. A-3, Vashaw Dep Ex. 30, Dum Dums Non-Standard Trade Dress; Ex. C, Pl.'s Interrog. Resp. No. 13; D.I. 17-2 at 11. Spangler admitted that only 80% of Spangler's DUM DUMS sales are packaged in the "everyday" red bags. Ex. A, Vashaw Dep. at 28:10-13. The remaining 20%, designed for holidays or non-traditional flavor combinations, are sold in different colored packaging including blue, purple, pink, brown, white, orange, blue and red, brown and black, and orange and black. Ex. A, Vashaw Dep. at 28:10-21, 111:10-121:6, 187:14-188:12, Exs. A-2, A-3; Ex. C at Resp. No. 13. There is also variation among the "everyday" bags: (1) the yellow oval, or "violator," is not always on the lower right-hand side of the bag, but on the left or in the center, or does not appear at all (D.I. 17-2 at 11; Ex. D, DUM DUMS "Everyday" Bag at Dollar General; Ex. E DUM DUMS "Everyday" Bag at Target); (2) the display window does not always appear in the lower half of the bag, or above a red bottom border of the bag, but instead appears on the left side of the bag, or is barely visible along the top and bottom edges of the bag (D.I. 17-2 at 11; Exs. D, E); and

(3) for the bags with a violator, it does not always cover a portion of the display window (D.I 17-2 at 11).

Spangler also admitted that the Dum Dums packaging includes several elements that Spangler omitted from its claim of trade dress. Ex. A, Vashaw Dep. at 35:1-38:10; 43:11-44:2. Those "unclaimed" elements include: (1) "a blue ribbon with a yellow outline running across the bag with multicolored dots in it"; (2) the "Drum Man" logo; (3) "a triangle of blue in the upper left-hand corner [of the bag]"; and (4) the "sashay wrap" on the lollipops visible through the display window. *Id.* Spangler further admitted that Dum Dums sits on store shelves next to and competes with any and all candy products—chocolate and non-chocolate—and not just with lollipops. *Id.* at 79:15-80:9.

## II.   ARGUMENT

"Preliminary injunction is an extraordinary remedy." *Leary*, 228 F.3d at 739. Courts balance four factors to determine whether to issue a preliminary injunction: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Leary*, 228 F.3d at 736. Spangler must establish its case by clear and convincing evidence. *Deck*, 29 F. Supp. 2d at 433 (citing *Garlock*, 404 F.2d at 257).

Spangler has fallen far short of carrying its burden. Indeed, it fails on each of the four factors. Spangler has not and cannot establish protectable rights in the purported trade dress. Even assuming *arguendo* it had such rights, Spangler has not demonstrated a likelihood of success as to infringement because it has not proven a likelihood of confusion between the parties' respective packaging. Moreover, Spangler fails to prove irreparable harm, a failure underscored by its own several month delay in seeking injunctive relief and its admission that the purported damages suffered can be compensated by monetary damages. Finally, it would not serve the public interest to allow Spangler to monopolize functional and nondistinctive packaging features, in direct contravention of the

purpose and intent of the Lanham Act. Accordingly, Spangler's motion should be denied.

**A.    Spangler Cannot Demonstrate A Likelihood Of Success On The Merits.**

To establish trade dress infringement, Spangler must prove by clear and convincing evidence first that: 1) the trade dress in question is primarily nonfunctional; and (2) the trade dress in question is distinctive in the marketplace. *Abercrombie & Fitch*, 280 F.3d at 629. Then, if is successfully meets its burden on these elements, Spangler must also prove, (3) the accused trade dress is likely to cause confusion. *Id.* (citing *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000)). "The first two elements are the requirements for protectability, and the third element is the standard for evaluating infringement." *Id.*

"All three of the foregoing requirements . . . are *elements* of a trade-dress infringement claim, not *defenses* to such a claim." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l., Inc.*, 730 F.3d 494, 504 (6th Cir. 2013) (emphasis in original) (citation omitted). The burden of proving each requirement therefore falls on Spangler. *Id.*; 15 U.S.C. § 1125(a)(3). Because Spangler failed to present clear and convincing evidence to support a finding in its favor as to any one of the three elements, Spangler's motion should be denied.

**1.    Spangler's Purported Trade Dress Is Not Protectable.**

"Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale." *Abercrombie & Fitch*, 280 F.3d at 629 (internal quotations omitted). "Trade dress involves the total image of a product and may include features such as size, shape, color, or color combinations, texture, graphics, or even particular sales techniques." *Id.* (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992)).

Spangler alleges its trade dress is comprised of three elements: (1) a red bag with a brand name in white letters; (2) a display window showing the product, located in the lower half of the

bag below the brand name and above a red bottom border of the bag; and (3) a yellow oval located on the lower right-hand side of the bag that covers a portion of the display window and that has large blue numerals inside the yellow oval, which is known as a "violator." D.I. 17-1 at 5. Because those elements are nondistinctive and in part functional, Spangler has no protectable trade dress rights. Indeed, it is curious that Spangler now claims trade dress rights in its packaging. Even though it has registered other trade dress with the U.S. Patent & Trademark Office, such as for its individual wrappers, Spangler admits that it has not sought a registration for the DUM DUMS packaging. Ex. A, Vashaw Dep. at 92:8-93:3.

### a. Spangler's Purported Trade Dress Is Primarily Functional.

"The functionality doctrine 'prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.'" *Abercrombie & Fitch*, 280 F.3d at 640 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164). "A trade dress's nonfunctional nature must be proven by the party asserting the trade dress protection." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006)  (citing 15 U.S.C. § 1125(a)(3); *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001)).

> In *TrafFix,* the Supreme Court identified two forms of functionality:
>
> The first, traditional functionality, deems a feature functional when "it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *Qualitex*, 514 U.S. at 165, 115 S.Ct. 1300 (quoting *Inwood Labs.,* 456 U.S. at 850 n. 10, 102 S.Ct. 2182). *Qualitex* "[e]xpand[ed] upon the meaning of this phrase [by] observ[ing] that a functional feature is one the 'exclusive use of which would put competitors at a significant non-reputation-related disadvantage.'"

*Abercrombie & Fitch*, 280 F.3d at 641. Rather than displace the traditional functionality standard from *Inwood*, the Court recognized that "the functionality doctrine may apply even to features of a product that are purely ornamental." *Id.* (citations omitted). "Thus, the 'significant non-reputation-related disadvantage' to competitors approach is the second form of trade dress functionality." *Id.*

Under the "effective competition" test for aesthetic functionality, protecting Spangler's purported trade dress would impose a significant non-reputation-related disadvantage on competitors. *See id.* at 642. Spangler's own words belie any claim that its trade dress is nonfunctional. First, Spangler admits that "some components of its trade dress are used to convey information about the product." D.I. 17-1 at 12. *See Abercrombie & Fitch*, 280 F.3d at 642-43. The claimed display window is "so consumers can see the -- so they can see the pops, they can see the variety of flavors … showing the product, showing the actual product to the consumer." Ex. A, Vashaw Dep. 43:11-19. Spangler also failed to identify the many candy bags that have a display window where the brand name appears above the window, most certainly due to the benefit afforded by such placement: the "prominent disclosure" of the brand name is "[t]he most common and effective means of apprising intending purchasers of the source of goods." *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1446 (Fed. Cir. 1984) (quoting *Venn v. Goedert*, 319 F.2d 812, 816 (8th Cir. 1963)); *Abercrombie & Fitch*, 280 F.3d at 646-48.

Second, Spangler explains the selection of the color red by relying upon a hearsay 2016 study that addresses color psychology in product packaging. D.I. 17-3 at 19-21.[3] Spangler highlights that color "[i]s one of the most important components for *attracting shoppers*. It plays a crucial role in *getting your shopper to see what you want them to see, feel what you want them to feel, and to do what you want them to do*." D.I. 17-3 at 19. Spangler notes that "85% of consumers attribute color as a primary reason for purchasing behavior," and that the color red elicits "hunger"—which is undeniably advantageous when used for a food product. D.I. 17-3 at 21. Spangler's rationale for selecting red comports with the Supreme Court's finding that "color can never be inherently distinctive"—"with color, consumers are aware of the reality that, almost invariably, that feature is intended not to identify the source, but to render the product itself more useful or more appealing."

---

[3] Tootsie concurrently moves to exclude Mr. Uline's testimony for not meeting the standards of Fed. R. Evid. 702.

*Wal-Mart*, 529 U.S. at 206, 211 (citing *Qualitex*, 514 U.S. at 162-63). In view of the ubiquity of the color red for candy packaging, others have caught on to the color's power, especially at Christmas and Valentine's Day. *See, e.g.*, Appendix A, Third-Party Packaging Examples; Ex. F, Declarations from the Purchasers of the Packaging Examples in Appendix A; Bowen Decl. ¶¶ 23-24; Ex. A-3. Spangler simply cannot carry its burden of proof with respect to nonfunctionality.

### b. Spangler's Purported Trade Dress Is Not Inherently Distinctive.

Although trade "dress can be inherently distinctive if its 'intrinsic nature serves to identify a particular source,'" "there is nothing arbitrary or fanciful, *or in any way distinctive,* about the combination of" common colors and forms that comprise Spangler's purported trade dress. *Abercrombie & Fitch*, 280 F.3d at 635, 638 (emphasis original) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). The same combination of elements is ubiquitous in the candy industry, where the most commonly used colors for children's candy are primary colors. Bowen Decl. ¶¶ 13, 22-24, 33. For example, after this lawsuit was commenced, Tootsie purchased 46 third-party bags of candy that have primarily red packaging. Appendix A; Ex. F. Of those, 42 of 46 are red in combination with yellow and/or blue; 19 of 46 use white lettering in the brand name; 42 of 46 bear a display window below or behind the brand name; 17 of 46 include an oval-shaped violator containing text or numerals that covers a portion of the display window; and 5 of 46 bear yellow violators. *Id.* Ten of 46 bags are lollipops. *Id.* Images from all 46 of these bags are presented in Appendix A; limited examples of third-party products bearing the purported trade dress are illustrated below and in the Introduction:



In light of the common use of the colors red, yellow, blue and white, transparent windows, informational violators, and prominent display of brand names, there is nothing distinctive about Spangler's asserted trade dress.

<strong><em>c. Spangler Failed To Establish Secondary Meaning.</em></strong>

Because Spangler's claimed trade dress is not inherently distinctive, it is protectable only if Spangler proves that it has acquired distinctiveness or "secondary meaning." *Wal-Mart*, 529 U.S. at 213. Secondary meaning occurs when, in the minds of the consuming public, the primary significance of the trade dress comes to identify the source of the product rather than the product itself. *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1240 (6th Cir. 1991). "The [trade dress] design must be one that is instantly identified in the mind of the informed viewer [to be Spangler's]." *Id.* at 1240.

Spangler generally contends that the Court should find secondary meaning based on Spangler's "dominant market share" and Tootsie's awareness of the DUM DUMS packaging. D.I. 17-1 at 13-16. The Sixth Circuit considers seven factors in determining whether a mark has acquired secondary meaning: (1) consumer surveys; (2) direct consumer testimony; (3) amount and manner of advertising; (4) exclusivity, length, and manner of use; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Herman Miller, Inc. v. Palazzetti Imp. & Exp., Inc.*, 270 F.3d 298, 311-12 (6th Cir. 2001) (citing *TrafFix*, 200 F.3d at 937). Spangler fails to address some of these factors at all, and its arguments on those it does address are ineffective. "The evidentiary burden necessary to establish secondary meaning is substantial." *Chrysler Grp. LLC v. Moda Grp. LLC*, 796 F. Supp. 2d 866, 873 (E.D. Mich. 2011) (quoting *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989)). Spangler has not met that burden.

Spangler cites no direct consumer testimony and offers no survey evidence on the issue of secondary meaning. This is critical, as "consumer surveys are the most direct and persuasive

evidence of secondary meaning." *Ward v. Knox Cty. Bd. of Educ.*, 612 F. App'x 269, 273 (6th Cir. 2015) (describing the absence of direct consumer testimony or consumer surveys as "crucial"). To support a finding of secondary meaning, Spangler does cite the results of a *Squirt* format likelihood of confusion survey its expert Mark Keegan conducted. D.I. 17-1 at 15-16. However, besides that it should be excluded, ***Mr. Keegan's Squirt survey did not and cannot test for secondary meaning***. Declaration of Sarah Butler ("Butler Decl.") ¶¶ 9, 19 n.12; *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 233 (3d Cir. 2017) ("Nevertheless, a well-designed *Squirt* survey may show a likelihood of confusion. What it does not do or even purport to do, however, is prove secondary meaning."). Indeed, Mr. Keegan, himself declined to rely on his survey to show alleged secondary meaning. Ex. G, October 11, 2018 Deposition of Mark Keegan ("Keegan Dep.") at 23:20-24:9 (asked to state the basis for the conclusion that bag has secondary meaning, failing to cite his survey); 60:2-15; *see also id.* at 21:23-24:2. Even if Mr. Keegan's report were relevant on this point, his survey, as detailed in Tootsie's *Daubert* motion, fails to meet standard and fundamental requirements for reliability. Butler Decl. ¶¶ 19-36. Accordingly, Mr. Keegan's survey results, and Spangler's misplaced reliance on them, must be rejected.

The remaining factors do not support a finding of secondary meaning. Again, as discussed and illustrated in section II.A.1.b, above, and again in section II.A.2.b, below, the purported trade dress is ubiquitous in the candy market. Spangler's use is merely one in a crowded field. Spangler contends that "[b]efore Tootsie [Roll] introduced its new packaging, Spangler's bag was the only lollipop bag whose primary color was red." D.I. 17-1 at 13. This is false. There are at least ten other lollipop brands in predominantly red packaging sold in the U.S., some shown on the next page:



Appendix A; Ex. F. Spangler concedes it neither advertises DUM DUMS (D.I. 17-1 at 14) nor makes any effort to promote the conscious connection in the public's mind between the purported trade dress and Spangler (Ex. A, Vashaw Dep. at 203:9-204:6). Although Spangler claims it has used red packaging for 23 years and the current packaging since 2011, the Sixth Circuit has refused to find secondary meaning based on even 20 years of *exclusive*, continuous use. *Ward*, 612 F. App'x at 273. Spangler's use is far from exclusive.

Moreover, Spangler's inconsistent use of the purported trade dress precludes a finding of secondary meaning. The only element of Spangler's claimed trade dress consistently used across DUM DUMS packaging is the brand name in white letters, for example:

  

  

*See, e.g.*, Ex. A, Vashaw Dep. at 111:10-121:4, 187:14-188:12, Exs. A-2, A-3; Ex. C at Resp. No. 13; Exs. D, E; D.I. 17-2 at 11. In order to establish secondary meaning, however, "[t]he elements specified as the trade dress must be present in every item in that product line." *R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 77 (S.D.N.Y. 2009) (citation omitted). "[B]ecause the specific elements of the trade dress listed by [P]laintiff are not present in all of the [DUM DUMS packaging], trade dress protection for these [] products is not appropriate." *Id.*

Finally, Spangler claims that Tootsie intentionally copied the purported trade dress, but "was smart enough not to copy every detail precisely." D.I. 17-1 at 8. Tootsie rejects Spangler's baseless claim of copying, and incorporates by reference its detailed discussion on this point from section II.A.2.d, below.

\*     \*     \*     \*

The arguments of Spangler's counsel as to the nonfunctionality and distinctiveness of the purported trade dress do not constitute proof. Spangler's evidence is woefully insufficient to support a likelihood that it can meet its substantial evidentiary burden to prove rights in protectable trade dress. Thus, the granting of the extraordinary remedy of a preliminary injunction would be improper.

### 2.     There Is No Likelihood Of Confusion Between The Parties' Packaging.

Even if Spangler could demonstrate that its purported trade dress is protectable, Spangler still cannot establish the likelihood of confusion. In the Sixth Circuit, courts consider the eight *Frisch* factors when assessing the likelihood of confusion: (1) similarity of the trade dress; (2) strength of the Spangler's trade dress; (3) evidence of actual confusion; (4) defendant's intent in selecting the

trade dress; (5) likely degree of purchaser care; (6) marketing channels used; (7) relatedness of the goods; and (8) likelihood of expansion of the product lines. *Gray*, 295 F.3d at 646 (citing *Frisch's Rest.*, 759 F.2d at 1266. Tootsie acknowledges that the parties sell the same goods through overlapping marketing channels. Those factors (6 and 7) standing alone, however, are insufficient to support a finding of likelihood of confusion. The remaining *Frisch* factors weigh heavily against Spangler.[4]

### a. The Parties' Packaging Are Dissimilar.

The parties prominent display of the logos on their respective packaging eliminates any likelihood of confusion. *Groeneveld*, 730 F.3d at 509-10, 515 (finding no possibility of trade dress confusion where, "critical[ly]," the parties prominently displayed their trademarks on otherwise similar products); *Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150, 158 (6th Cir. 2003) (logo sufficient to distinguish trade dress) (citing *Abercrombie & Fitch*, 280 F.3d at 647-48) (holding no rational trier of fact would confuse catalogs because of the conspicuous placement of each company's trademarks); *Gray*, 295 F.3d at 648 (finding popcorn packaging trade dress dissimilar in view of the parties' prominent display of their respective trademarks, despite having colors and an image of the Chicago skyline in common).[5] The CHARMS MINI POPS and DUM DUMS logos occupy nearly half of the Tootsie and Spangler packaging, respectively, as illustrated at right.



---

[4] Because the eighth factor—likelihood of expansion of the product lines—is irrelevant to this case and thus neutral, Tootsie, like Spangler, declines to address it.

[5] *See also Syndicate Sale, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 637 (7th Cir. 1999) ("This and other circuits have considered distinct labeling and packaging as significant factors in determining whether there is a likelihood of confusion."); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992) (finding that the "presence and prominence" of trademarks "can go far towards eliminating any possible confusion"); *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194-95 (1st Cir. 1980) ("Each manufacturer displayed its name and logo prominently . . . , clearly identifying [the product's] origin[, so] . . . there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.").

These oversized displays are an indication of each product's origin that eliminates any potential for confusion. Indeed, "[t]he most common and effective means of apprising intending purchasers of the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name . . . [and when] that is done, there is no basis for a charge of unfair competition." *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1446 (Fed. Cir. 1984) (quoting *Venn v. Goedert*, 319 F.2d 812, 816 (8th Cir. 1963)).

The effect of the parties' logos was also highlighted in some of the responses to the likelihood of confusion survey of Tootsie's expert Brian Sowers. In response to his open-ended questions, a number of respondents commented that they knew the CHARMS MINI POPS bag came from Charms, not Spangler, because of the labeling. Declaration of Brian Sowers ("Sowers Decl.") at Appendix G. One respondent (*id.* at G-86) used an emoji to reinforce the effortlessness of the conclusion:

| | |
|---|---|
| 748 | Because the Bag Says "Charms" in pretty big letters :) |

Although the parties' prominently displayed logos, alone, are sufficient to end the confusion inquiry, there are numerous additional elements that distinguish the parties' packages. Bowen Decl. ¶¶ 15-17, 26-27; D.I. 17-2 at 11-12, 15. Comparing the parties' 300-count bags, for example, Spangler's bag is fire-engine red with a small oval display window, largely obscured by other elements, and includes the DUM DUMS and "Drum Man" logos, a blue ribbon with a yellow outline running across the bag with multicolored dots in it, and a relatively small violator. *Id.* at 27; D.I. 17-2 at 12, 15. By contrast, Tootsie's bag is a different shade of red, with a large rectangular display window that extends across the length of the bag and wraps 360 degrees around its circumference. Bowen Decl. ¶ 26. The window is only partially obscured by the "high visibility" violator. *Id.* That violator is about twice the size of Spangler's, has a red "shadow" wrapping around the top half, and includes the phrase "SHOP & COMPARE" in large dark blue lettering above the pop count. *Id.* These differences are substantial.

Moreover, Spangler cherry-picked from its packaging the asserted trade dress elements while ignoring those elements that do not appear in Tootsie's packaging, including, "a blue ribbon with a yellow outline running across the bag with multicolored dots in it," the "Drum Man," "a triangle of blue in the upper left-hand corner [of the bag]," the "sashay wrap" on the lollipops visible through the window, and others. Ex. A, Vashaw Dep. at 35:1-38:10, 43:11-44:2. As trade dress constitutes the "overall appearance of a product," *Abercrombie & Fitch*, 280 F.3d at 629, Spangler's failure to analyze these additional elements as part of the overall appearance, and the lack of any of those elements on the CHARMS MINI POPS bag, should dispose of Spangler's claim.

The highly dissimilar overall impressions created by the oversized displays of the parties' respective DUM DUMS and CHARMS MINI POPS logos, and numerous other distinguishing features, render the parties' trade dresses so "clearly distinguishable" so as to "resolve the issue of the dresses' similarity." *Abercrombie & Fitch*, 280 F.3d at 647-48. Tootsie's "resounding success on this factor makes [P]laintiff's burden of prevailing on the seven other *Frisch* factors effectively insurmountable." *Id.*

### b. Spangler's Purported Trade Dress Is Exceedingly Weak In the Candy Market.

"The strength of [trade dress] is a determination of the [it]s distinctiveness and degree of recognition in the marketplace." *Gray*, 295 F.3d at 646 (quoting *Homeowners Group, Inc. v. Home Mktg. Specialists*, 931 F.2d 1100, 1107 (6th Cir. 1991)).

> Strength of [Spangler's] trade dress depends upon the interplay of two elements [: (1)] the uniqueness of the trade dress; and [(2)] the investment in imbuing a trade dress with secondary meaning. Thus, the most mundane packaging may be infused with meaning by advertising and other promotional tools, rendering a strong trade dress. Likewise, particularly unique packaging even without any artificial efforts to establish a secondary meaning for the product may result in a strong trade dress. The combination of these two factors determines the relative strength or weakness of the trade dress.

*Gray*, 295 F.3d at 647.

Spangler's purported trade dress is exceedingly weak in the candy market. Spangler concedes it neither advertises DUM DUMS (D.I. 17-1 at 14) nor makes any effort to promote the conscious connection in the public's mind between the purported trade dress and Spangler (Ex. A, Vashaw Dep. at 203:9-204:6). And "neither the elements of the packaging nor [lollipops them]sel[ves] [a]re exclusive or unique." *Gray*, 295 F.3d at 647. As discussed in section II.A.1.b above, the same combination of packaging elements—red packaging, with a window in the lower half, prominent display of the candy name in white, and the use of violators—is ubiquitous in the candy market. Again, as shown in II.A.1.b, the 46 third-party bags Tootsie has purchased show that the candy and lollipop markets are flooded with red packaging; red packaging in combination with yellow and/or blue; white brand names; a display window below or behind the brand name; oval-shaped violators containing text or numerals; and yellow violators. The extensive use of these elements in the marketplace confirms that Spangler's purported trade dress lacks distinctiveness and therefore lacks strength as an indicator of source. *Big Time Worldwide Concert & Sport Club at Town Ctr., LLC. v. Marriott Int'l, Inc.*, 236 F. Supp. 2d 791, 800 (E.D. Mich. 2003) (citing *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991)).

Spangler's purported trade dress is just one use in a crowded field, and is thereby substantially weakened. *Homeowners Grp.*, 931 F.2d at 1108 (evidence of crowded field of third-party uses substantially weakens the strength of a trademark); *see Big Time Worldwide*, 236 F. Supp. 2d at 799 ("[T]he greater the number of identical or more or less similar trade-marks already in use on different kinds of goods, the less is the likelihood of confusion."). In this kind of crowded field, "customers will not likely be confused between any two of the crowd" because they learn to distinguish one from another. *Big Time Worldwide*, 236 F. Supp. 2d at 800 (quoting *4 McCarthy on Trademarks & Unfair Competition* § 11:85).

In sum, in view of the absence of any uniqueness of Spangler's purported trade dress, or any significant branding investment in the packaging that might have resulted in consumer awareness of

the source-identifying significance of the claimed trade dress, Spangler's trade dress is at best an exceedingly weak source indicator. Thus, this *Frisch* factor weighs heavily against finding a likelihood of confusion.

> **c.** **There Is No Evidence Of Actual Confusion As To The Source Of The Parties' Products.**

Spangler concedes it "is not aware of any actual complaints of confusion." Ex. A, Vashaw Dep. at 44:8-23; Ex. C at Resp. No. 5. Spangler relies on the results of a *Squirt* format likelihood of confusion survey conducted by its expert, Mark Keegan. However, the Keegan survey is so flawed as to have no probative value and should be excluded.

On behalf of Tootsie, two separate, independent survey experts, Sarah Butler and Brian Sowers, conducted surveys utilizing standard and reliable methods. Butler Decl. ¶¶ 10-11, 38-74, 76-77; Sowers Decl. ¶¶ 9, 13-66 Their survey results indicate that the level of confusion among consumer is ***effectively zero***. Butler Decl. ¶¶ 63-74, 76; Sowers Decl. ¶ 57-67. This level is well below what other courts have relied upon to find no likelihood of confusion—let alone relied upon to deny a preliminary injunction.[6]

> **(1)** *Spangler's Keegan Survey Proves Nothing.*

Spangler relies on the results of Mr. Keegan's *Squirt* survey to support a finding of likelihood of confusion. D.I. 17-1 at 18. Mr. Keegan's survey and opinion fail to meet the standards of Federal

---

[6] *See Bruce Lee Enters., LLC v. A.V.E.L.A.*, 2013 WL 2333 KMW, 2013 WL 822173, at *21-*22 (S.D.N.Y Mar. 6, 2013) (finding **11.6-12% net confusion alone was insufficient to conclude confusion was likely**); *E & J Gallo v. Proximo Spirits, Inc.*, No. CV-F-10-411 LJO JLT, 2012 WL 273076, at *18 (E.D. Cal. Jan. 30, 2012) (**1% confusion rate was "highly probative of the lack of likelihood of consumer confusion"**); *Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF HRL, 2010 WL 2486364, at *8 (N.D. Cal. June 15, 2010) (**8% confusion rate indicated that confusion was unlikely**); *Hansen Beverage Co. v. Cytosport, Inc.*, No. CV 09-0031-VBF AGRx, 2009 WL 5104260, at *16 (C.D. Cal. Nov. 4, 2009) (**12.5% net confusion rate not independently sufficient to show consumer confusion**); *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 375 (S.D.N.Y. 2003) (**9.5% confusion level could not sustain plaintiff's contention of actual confusion**); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1040 (C.D. Cal. 1998) (**6.9% confusion rate suggested "there is little likelihood of confusion"**); *Mini Melts, Inc. v. Reckitt Benckiser LLC*, 118 U.S.P.Q.2d 1464, 2016 WL 3915987, at *14-*15 (T.T.A.B. 2016) (**7-8.5% confusion rate showed, "at worst, a *de minimis* level of confusion" and, if anything, supported the applicant's position of no likelihood of confusion**).

Rule of Evidence 702 for expert testimony due, at the least, to their deep methodological flaws. Those flaws are detailed in Tootsie's *Daubert* Motion to Exclude the Expert Testimony and Expert Reports of Mark Keegan and Steve Uline, filed contemporaneously with this opposition. To the extent the Court does not grant that motion, the motion and supporting brief details why Mr. Keegan's testimony should be given no weight.

(2)     *The Butler Survey Shows Minus 1.0% Likely Confusion.*

Mr. Keegan himself described Tootsie's survey expert Sarah Butler as a "professional in the field, very well qualified." Ex. G, Keegan Dep. at 71:20-72:9. Like Mr. Keegan, Ms. Butler conducted a *Squirt* format likelihood of confusion survey. Butler Decl. ¶¶ 38-62 However, Ms. Butler's survey corrected for the flaws in Mr. Keegan's survey design. Butler Decl. ¶¶ 10-12, 24-37, 75-76. Unlike Mr. Keegan, Ms. Butler used filter questions and randomized response options in order to minimize or limit guessing, and used open-ended questions in order to glean insight as to the potential reasons for confusion. Butler Decl. ¶¶ 10-11, 35-37, 75-76. Instead of using multiple "internal" controls, Ms. Butler used an appropriate control stimulus—the old yellow CHARMS MINI POPS packaging (Butler Decl. ¶¶ 9, 29-34, 36, 62) that Spangler described as having "graphic components and an overall visual impression that [i]s unlike the trade dress of Spangler's DUM DUMS® lollipop bags." D.I. 1 ¶ 19. Also unlike Mr. Keegan, Ms. Butler used an appropriate array of stimuli in which several products incorporated at least one element of the purported trade dress. Butler Decl. ¶¶ 29-33, 58-62. Finally, again unlike Mr. Keegan's survey, respondents were shown on a first screen an image of the DUM DUMS packaging, and then, on subsequent screens, a randomized array of stimuli, one screen at a time. Butler Decl. ¶¶ 33, 58-62.

**Ms. Butler's survey of 400 respondents resulted in a net confusion rate of minus 1.0%** (Butler Decl. ¶¶ 10, 73), which is highly probative of the lack of likelihood of consumer confusion. *First Nat'l Bank in Sioux Falls v. First Nat'l Bank So. Dakota*, 679 F.3d 763, 770-71 (8th Cir. 2012) (finding net confusion rate of 0.1% supports a finding of no likelihood of confusion).

*(3)     The Sowers Survey Shows 0.2% Likely Confusion.*

Tootsie's second survey expert, Mr. Sowers, conducted an *Eveready* format likelihood of confusion survey. Sowers Decl. ¶ 18. In an *Eveready* survey, respondents are presented with the junior user's product—in this case, the accused red CHARMS MINI POPS packaging—and then asked open-ended questions about the source of the product. *Id.* An *Eveready* survey is an appropriate design to measure consumer confusion when the senior mark is "strong and widely recognized." *Id.*; J. Thomas McCarthy, 6 McCarthy on Trademarks and Unfair Competition § 32:173.50 (5th ed. 2018). Because Spangler has repeatedly claimed DUM DUMS are an established and well-known brand (D.I. 1 at 3), in this case, the *Eveready* format is an appropriate survey design to measure likelihood of confusion. *Id.* Like Ms. Butler, Mr. Sowers adhered to all standards and requirements for reliability. *Id.* ¶¶ 13-17. For example, he used filter questions and randomized response options in order to minimize guessing and avoid any potential response bias. *Id.* ¶¶ 14-17. He also used an appropriate control stimulus—the same yellow CHARMS MINI POPS packaging used by Ms. Butler. *Id.* ¶¶ 6, 21-22. Survey respondents were split into test and control groups. *Id.* ¶¶ 19-24. Test group respondents were shown the accused red packaging while control group respondents were shown the yellow packaging. *Id.* ¶ 22. Respondents were then presented with several open-ended questions, all of which provided opportunities for respondents to indicate their belief that the new red CHARMS MINI POPS packaging is associated with DUM DUMS. *Id.* ¶¶ 17-18, 56-65.

**Mr. Sowers's survey of 398 respondents resulted in a net confusion rate of 0.2%** (*Id.* ¶¶ 65-67), which, like Ms. Butler's survey, is highly probative of the lack of likelihood of consumer confusion.

In view of the fatal flaws in Mr. Keegan's survey methodology, his survey results and Spangler's reliance on them, must be rejected. Ms. Butler's and Mr. Sower's surveys, both of which adhere to standard accepted practices, demonstrate that likelihood of confusion is nil. Thus, the third *Frisch* factor weighs heavily in Tootsie's favor.

### d. Tootsie Had No Intent To Deceive Or Confuse Consumers When It Adopted The Accused Packaging.

Spangler's contention that Tootsie intentionally copied Spangler's purported trade dress (D.I. 17-2 at 8, 15) is blatant speculation, based on nothing more than Tootsie's awareness of Spangler's product. Such awareness is insufficient to show an intent to deceive consumers. *See AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 800 (6th Cir. 2004). Tootsie has neither intent nor motivation to deceive consumers into believing its CHARMS MINI POPS are made by or associated with Spangler. Bowen Decl. ¶ 30. To do so would be contrary to Tootsie's strategy to leverage one of its most valuable assets—the 100-plus-year-old, $50 million in revenues per year CHARMS brand—in an effort to recapture market share. *Id.* Tootsie has invested substantial time and resources on this strategy, including a packaging redesign that bears a drastically enlarged CHARMS MINI POPS logo intended to emphasize the CHARMS brand above all else. *Id.* ¶¶ 12, 16, 31. In fact, Tootsie went so far as to emblazon the CHARMS MINI POPS logo across the entirety of the bottom of the packaging so that, in the event the bag tips over on a shelf, consumers will still immediately recognize CHARMS as its source. *Id.* ¶ 31.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ Contrary to Spangler's allegation that Tootsie's violator is "the biggest tell of all" (D.I. 17-1 at 15), "the similarity serves the procompetitive purpose of signaling the existence of a competitive alternative by alerting potential consumers" to compare CHARMS MINI POPS with DUM DUMS. *Groeneveld*, 730 F.3d at 514.

Even assuming *arguendo* that Tootsie had copied Spangler's purported trade dress, proof of copying alone is not conclusive on this factor: There is a difference between copying and copying

*with intent to cause confusion. Groeneveld*, 730 F.3d at 514. This distinction is important. Evidence that "a junior user copie[d] a competitor's product design because it sells better and consumers seem to like it … is not evidence of an intent to confuse." J. Thomas McCarthy, *4 McCarthy on Trademarks and Unfair Competition* § 8:19 (5th ed. 2018). Spangler must put forth some evidence showing that Tootsie's copying was done with intent to confuse consumers. *Id.* at § 23:110 ("[T]he only kind of intent that is relevant to the issue of likelihood of confusion is the intent to confuse."). As evidenced by the oversized CHARMS MINI POPS logo, there is no such evidence here because Tootsie had no such intent—indeed, the label has procompetitive effects. As the Sixth Circuit explained in *Groeneveld*:

> differential labeling is critical—it transforms a practice that would otherwise be anticompetitive into one that is procompetitive. And by specifically targeting [Spangler's] customers, [Tootsie] focuses its competitive activity on those who are most interested in such competition, thereby decreasing the consumers' search costs and intensifying competition where it matters most. None of this is to say, of course, that consumers should switch from [Spangler] to [Tootsie] or that [Tootsie] makes [superior lollipops]. The point, rather, is that the state of affairs where consumers are aggressively courted and offered competitive options is beneficial as a matter of public policy.

*Id.* at 515. In view of the above, the fourth *Frisch* factor weighs in Tootsie's favor.

### e.  Likely Degree Of Purchaser Care

Circumstances may require that a court deviate from "the general proposition that the average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products, such as snack food." *Gray*, 295 F.3d at 649 (citation omitted). Such circumstances are present in this case.

Spangler inexplicably argues: "Most consumers do not spend time reading the packaging of low-cost items like lollipops. That is why *the font of the packaging text tends to be very small and arranged so that the consumer is not required to read the packaging*." D.I. 17-1 at 18 (emphasis added). Spangler's argument is inapplicable to this case. Again, Spangler's and Tootsie's CHARMS MINI POPS and DUM DUMS logos occupy nearly half of their respective packaging. Whether a

purchaser spend five seconds or five minutes reading that packaging, the prominently displayed logos eliminate any possibility of confusion between the parties' products. *See, e.g., Gray*, 295 F.3d at 648; Ex. A, Vashaw Dep. at 78:5-21 (admitting logo print is large).

Thus, the fifth *Frisch* factor weighs in favor of Tootsie.

\* \* \* \* \* \*

The balancing of the *Frisch* factors, above, weighs heavily in Tootsie's favor and establishes that there is no likelihood of confusion between the parties' packaging. Even assuming Spangler's trade dress is protectable, the prominent displays of the parties' logos eliminate any possibility of confusion. Moreover, Spangler's purported trade dress is exceptionally weak in the candy market. Spangler concedes it has no evidence of actual consumer confusion even after nearly a year of coexistence, and Tootsie's results from two independent surveys confirm that confusion is not likely. There simply is insufficient evidence to conclude that Spangler is likely to succeed on the merits of its infringement claim. Accordingly, Spangler's preliminary injunction motion should be denied.

**B.    Spangler Failed to Demonstrate Irreparable Harm.**

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citations omitted); *Wells Fargo v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 771 (E.D. Mich. 2003). Irreparable harm means more than merely "substantial" harm. *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 771 (E.D. Mich. 2003) (citation omitted). Spangler must show that unless Tootsie immediately ceases selling CHARMS MINI POPS in the accused packaging, Spangler will suffer actual and imminent harm, rather than harm that is speculative or unsubstantiated. *See Abney v. Amegen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citation omitted). Spangler has made no such showing.

Spangler failed to put forward any evidence of harm resulting from Tootsie's use of the accused trade dress, let alone irreparable harm. Spangler's irreparable harm "argument" consists of

nothing more than a collection of case law quotations, none of which Spangler ties to the facts of this case. To the extent Spangler's quotes suggest a presumption of irreparable harm, "[n]umerous courts have recognized that any presumption of irreparable injury resulting from a court's finding that the plaintiff can show a substantial likelihood of success on the merits is rebutted by a delay of even a few months in seeking preliminary injunctive relief." *Vita-Mix Corp. v. Tristar Prods., Inc.*, No. 1:07 CV 275, 2008 WL 11383504, at *9 (N.D. Ohio Sept. 30, 2008) (citing *McCarthy on Trademarks and Unfair Competition* § 31:32 (4th ed. 1998)). Although irreparable harm may be found when a party risks losing control over the quality of mark bearing goods, that danger is not present here. *PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 334 (6th Cir. 2018) (citation omitted). Spangler does not claim that CHARMS MINI POPS are inferior to DUM DUMS, but merely observes that "[t]hey are both lollipops." D.I. 17-1 at 17. Accordingly, if a consumer were confused and purchased CHARMS MINI POPS intending to purchase DUM DUMS, the only harm is financial and compensable.

Spangler conspicuously omits from its brief that it has indeed already calculated past and future monetary damages purportedly suffered as a result of Tootsie's alleged infringement. Ex. C at Resp. No. 12. Spangler's CEO testified that if Spangler's lawsuit succeeds, he has no doubt Tootsie would have the financial capacity to pay those damages. Ex. A, Vashaw Dep. at 204:7-16. Because Spangler's claimed injuries can be compensated by monetary damages, any such injuries are, by definition, not irreparable. *See PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 334 (6th Cir. 2018); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578-79 (6th Cir. 2002).

Finally, Spangler's unexplained delay in seeking an injunction—estimated based on Spangler's testimony to be between six and nine months[7]—weighs against a finding of irreparable

---

[7] Spangler testified it learned of the accused CHARMS MINI POPS packaging in 2018 in "the beginning part of the year" (Ex. A, Vashaw Dep. 80:17-23), and Spangler's CEO viewed the packaging for the first time in "mid-winter" (*Id.* at 85:20-86:2). Assuming conservatively that Spangler learned of the accused CHARMS Mini Pops packaging on the last day of winter, March 20, Spangler delayed filing its motion for at least six months and as many as nearly nine months, including a three month delay after filing suit. *Id.* at 194:24-195:22; *BuzzBallz, LLC v. JEM Bev. Co.*, No. 3:15-CV-

harm. *McDonald's Corp. v. Burger King Corp.*, 87 F. Supp. 2d 722, 725 (E.D. Mich. 1999).[8] The

Sixth Circuit has held that nine months is "[s]ignificant delay in applying for injunctive relief in a

trademark case [that] tends to neutralize any presumption that infringement alone will cause

irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction

for trademark infringement." *Blockbuster v. Laylco, Inc.*, 869 F. Supp. 505, 516 (E.D. Mich. 1994)

(quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275-76 (2d Cir. 1985) (finding nine month delay

warranted denial of preliminary injunction)). In the trademark infringement context, Sixth Circuit

courts have declined to grant preliminary injunctions in the face of unexplained delays of four

months. *Real-Time Reporters, P.C. v. Sonntag Reporting Servs.*, No. 13 C 5348, 2013 WL 5818460,

at *3 (N.D. Ill. Oct. 29, 2013). After sitting on its rights for months, Spangler cannot now claim it

will be irreparably harmed without an injunction. Accordingly, Spangler's motion should denied.

## C. The Balance of Hardships Favors Tootsie.

The Sixth Circuit has made clear that, where the burden of an injunction would weigh as

heavily on the non-movant as the movant, the movant must make a showing of at least a "strong

probability of success on the merits" before a trial court is justified in issuing an injunctive order. *In

re DeLorean Motors*, 755 F.2d 1223, 1229 (6th Cir. 1985). As a standard, irreparable harm to the

movant must "decidedly outweigh" any potential harm to the non-movant if the injunction is issued.

*Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982).

Spangler fails to address the balance of hardships, thereby conceding it weighs in Tootsie's

favor. Indeed, an injunction would result in substantial harm to Tootsie and others. Bowen Decl.

¶ 33. Tootsie has invested heavily in the CHARMS MINI POPS packaging, and a redesign would be a

---

588-L, 2015 WL 3948757, at *1, 7 (N.D. Tex. June 26, 2015) (denying injunctive relief following a two-and-a-half-month delay between the filing the complaint and the preliminary injunction motion).

[8] *See also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248-49 (11th Cir. 2016) ("a delay in seeking a preliminary injunction of even only a few months . . . militates against a finding of irreparable harm"); *Pals Grp. v. Quiskeya Trading Corp.*, No. 16-23905-CIV-Goodman, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) (plaintiff's three-month delay in seeking a preliminary injunction was "by itself sufficient" to deny injunctive relief).

significant burden. *Id.* It would also be highly disruptive to Tootsie's day-to-day business operations if Tootsie is required to put the brakes on this popular product. *Id.* Furthermore, a second redesign within a year would negatively affect Tootsie's image and could result in the loss of customers—not only for CHARMS MINI POPS, but also for Tootsie's other products. *Id.* An injunction would further harm Tootsie (and others, including its customers) by preventing it from using functional and non-distinctive features in its product packaging that are ubiquitous in the candy industry. *Id.*

By contrast, Spangler concludes in another section of its brief—without a shred of evidence—that Tootsie's use of the CHARMS MINI POPS packaging has "caused Spangler to lose business and sales." D.I. 17-1 at 9-10. In fact, with respect to the one account Spangler claims to have lost to Tootsie since the packaging redesign, Spangler testified it has no knowledge of the retailer's reason for switching to CHARMS. Ex. A, Vashaw Dep. at 59:5-60:3.[9] Spangler's lost business and sales are most likely attributable to the fact that Tootsie has aggressively marketed CHARMS MINI POPS, enhanced the product with the addition of a new flavor assortment, and substantially dropped prices (Bowen Decl. ¶ 34), while Spangler has done no marketing and substantially raised prices by 8% (Bowen Decl. ¶ 35).

Under these facts, Spangler has not and cannot show any irreparable harm that would decidedly outweigh the substantial costs and injuries to Tootsie.

### D.  Denial Of Spangler's Motion Is In The Public Interest.

Finally, Spangler argues that the public has an interest in "halt[ing] confusion in the marketplace." D.I. 17-1 at 19-20. But Spangler not only conceded it has no evidence of actual consumer confusion, but also failed to establish its likelihood. Moreover, a preliminary injunction is not in the public interest because it would allow Spangler to monopolize functional and non-

---

[9] Spangler testified that a buyer told Spangler it had agreed to "test" CHARMS MINI POPS in its stores because CHARMS MINI POPS "have a better value than [DUM DUMS]." Ex. A, Vashaw Dep. at 60:20-61:4.

distinctive packaging features, in direct conflict with the purpose and intent of the Lanham Act. While there is no evidence that Tootsie copied Spangler's packaging, even if it had:

> as the Supreme Court advised, '[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying.' *TrafFix,* 121 S.Ct. at 1260. After all, copying preserves competition, which keeps downward pressure on prices and encourages innovation.

*Abercrombie & Fitch*, 280 F.3d at 640. Thus, a preliminary injunction would be adverse to public interest.

## III.    CONCLUSION

Spangler failed to prove it has rights in the purported trade dress and, in any case, failed to show a likelihood of confusion to establish infringement. Even if it overcame these hurdles, Spangler also failed to show irreparable harm warranting the extraordinary remedy of a preliminary injunction. For the foregoing reasons, Tootsie respectfully requests that the Court deny Spangler's motion for a preliminary injunction.

Respectfully submitted,

Date: November 7, 2018

/s/ John L. Strand
Robert C. Tucker (0084971)
ROBINSON, CURPHEY & O'CONNELL
Ninth Floor, Four Seagate
Toledo, Ohio 43604
Phone: 419.24937900
Fax: 419.249.7911
rtucker@rcolaw

John L. Strand (*pro hac vice*)
John L Welch(*pro hac vice*)
Stephanie G. Stella(*pro hac vice*)
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Phone: 617.646.8000
Fax: 617.646.8646
jstrand@wolfgreenfield.com
jwelch@wolfgreenfield.com
sstella@wolfgreenfield.com

*Counsel for Tootsie Roll Industries, LLC*

## CERTIFICATE OF SERVICE

I certify that this document and all of its exhibits are being filed through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ John L. Strand