# EXHIBIT A

**Redacted**

# In The Matter Of:

*Spangler Candy Company  v.*
*Tootsie Roll Industries, LLC*

---

*Kirk Vashaw*
*October 8, 2018*
*Video Deposition*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Original File Kirk Vashaw 10-12-18.txt
Min-U-Script® with Word Index

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF OHIO

 3                   WESTERN DIVISION

 4  SPANGLER CANDY COMPANY,      )

 5                               )
              Plaintiff,         )
 6                               )
         vs.                     ) Case No. 3:18-CV-1146
 7                               )
    TOOTSIE ROLL INDUSTRIES,     ) Judge Helmick
 8  LLC.,                        )
                                 ) CONTAINS CONFIDENTIAL
 9                               ) INFORMATION - ATTORNEYS'
              Defendant.         ) EYES ONLY
10

11                     - - -

12

13

14      VIDEO RECORDED DEPOSITION OF KIRK VASHAW

15

16    DATE:     October 12, 2018 at 9:32 a.m.

17    PLACE:    Shumaker, Loop & Kendrick
                1000 Jackson Street
18              Toledo, Ohio

19    REPORTER:  Casey G. Schreiner, RMR-RDR
                 Notary Public
20

21                     - - -

22

23

24
```

---

**Page 2**

```
 1  APPEARANCES:

 2       On behalf of the Plaintiff:

 3            SHUMAKER, LOOP & KENDRICK:
              David W. Wicklund
 4            1000 Jackson Street
              Toledo, Ohio 43604
 5            (419) 321-1213

 6
         On behalf of the Defendant:
 7
              WOLF, GREENFIELD & SACKS, P.C.:
 8            John Strand
              600 Atlantic Avenue
 9            Boston, Massachusetts 02210
              (617) 646-8000
10

11  ALSO PRESENT:

12            Kerrie Montgomery, Videographer

13                     - - -

14

15

16

17

18

19

20

21

22

23

24
```

---

**Page 3**

```
 1                    I N D E X

 2                   EXAMINATION
    Witness Name                        Page  Line
 3  KIRK VASHAW
       Examination By Mr. Strand .............  6     6

 4                    EXHIBITS

 5  Exhibit   Description                 Page  Line
    DX 7      Defendant Tootsie Roll ........  8     2
 6            Industries, LLC's, First Notice
              of Rule 30(b)(6) Deposition to
 7            Spangler Candy Company
    DX 8      Responses of Plaintiff Spangler 19    24
 8            Candy Company to Tootsie Roll
              Industries First Set of
 9            Interrogatories, Numbers 1
              through 15
10  DX 9      Declaration of Kirkland B. ..... 34     6
              Vashaw
11  DX 10     Trademarks - Registered TMs .... 90     6
    DX 11     Status Search SN3397436 ........ 91    14
12  DX 12     Status Search SN1535574 ........ 91    14
    DX 13     Reporting LP Brand MULO 52 Week  93    19
13  DX 14     Dum-Dums Retail Metrics: MULO .. 98     1
              (52 Weeks 2/25/18)
14  DX 15     Amazon.com; "Dum Sums" ......... 111     5
    DX 16     "Tootsie Roll Pops - Evaluation" 121    5
15  DX 17     Dum Dums Rebranding Package .... 139     3
              Testing & Refinement Final
16            Report
    DX 18     Image .......................... 156     1
17  DX 19     Brand Identity Guidelines ...... 158    10
    DX 20     E-mail - Martin to Eschhofen - . 165    15
18            9-10-18
    DX 21     E-mail - Martin to Eschhofen - . 169    15
19            9-10-18
    DX 22     Photograph ..................... 172     6
20  DX 23     E-mail - Martin to Eschhofen - . 172    15
              9-19-18
21  DX 24     Newswire - DumDums v. Charms: .  178     8
              Lollipop Makers Tell Each Other
22            to Suck It In New Packaging
              Lawsuit
23  DX 25     Picture ........................ 179    24
    DX 26     Dum-Dums Hopes Tootsie Takes a . 181     5
24            Licking in Court
```

---

**Page 4**

```
 1  DX 27     Picture ........................ 182     6
    DX 28     E-amil - Dixon to Eschhofen - .. 183     2
 2            9-17-18
    DX 29     Billback Detail ................ 185    22
 3  DX 30     Dum-Dums Round Unfilled in ..... 187    11
              Non-Standard Trade Dress
 4            2012-1028
    DX 31     Spangler Management Meeting .... 188    13
 5            Minutes April 9, 2018
    DX 32     E-mail - Vashaw to Knight - .... 198    12
 6            2-21-11

 7                   OBJECTIONS
    By                                  Page  Line
 8  Mr. Wicklund ............................ 152    22
    Mr. Wicklund ............................ 153    10
 9

10                     - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 5

1   **THE VIDEOGRAPHER:** We are going on
2   the record.  This is the start of the
3   video recorded deposition of Kirk Vashaw
4   in the matter of Spangler Candy Company
5   vs. Tootsie Roll Industries.
6   This deposition is being held at
7   Shumaker, Loop & Kendrick on October
8   12th, 2018, at approximately 9:15 a.m.
9   My name is Kerrie Montgomery with
10  O'Brien & Levine Court Reporting.  The
11  court reporter today is Casey Schreiner
12  with O'Brien & Levine Court Reporting.
13  Will counsel please state their
14  appearances and who they represent for
15  the record.
16  **MR. WICKLUND:** David Wicklund
17  representing Spangler Candy Company, the
18  plaintiff.
19  **MR. STRAND:** John Strand from
20  Wolf, Greenfield & Sacks representing
21  Tootsie Roll Industries, LLC, the
22  defendant.
23  **THE VIDEOGRAPHER:** Will the
24  court reporter please swear in the

Page 6

1   witness.
2   **KIRK VASHAW,**
3   a Witness herein, called by the Defendant as if upon
4   Examination, was by me first duly sworn, as
5   hereinafter certified, deposed and said as follows:
6   **EXAMINATION**
7   **BY MR. STRAND:**
8   Q.   Good morning, Mr. Vashaw.
9   A.   **Good morning.**
10  Q.   Am I pronouncing that correctly?
11  A.   **Right.**
12  Q.   First I want to go over some rules of
13  the road for today if that's okay.  First, I'll be
14  asking a series of questions obviously, and you'll be
15  answering.  Please let me finish my question before
16  you answer so the court reporter can get everything
17  down and so the videotape doesn't get messed up.
18  Do you understand?
19  A.   **I do.**
20  Q.   Okay.  And I'll give you the same
21  courtesy, let you finish your answer before I ask the
22  next question.
23  Is there any reason you couldn't give
24  true and accurate testimony today?

Page 7

1   A.   No.
2   Q.   And you understand, as you were just
3   sworn, that you're under oath today as if you would be
4   testifying before a judge or jury?
5   A.   **I understand.**
6   Q.   This is your deposition.  If you need a
7   break, please let me know at any time.  I'll just ask
8   that you answer the question that was pending at the
9   time.
10  A.   **Okay.**
11  Q.   You're entitled to clear questions.  I
12  sometimes, as Casey unfortunately knows, speak too
13  quickly, and can combine my words.  If you don't
14  understand my question, please ask me to rephrase; if
15  you don't understand what it means, please ask me to
16  rephrase and I'll do my best.
17  A.   **Okay.**
18  Q.   But if you do answer a question, I'm
19  going to assume that you understood it.  Okay?
20  Have you ever been deposed?
21  A.   **No.**
22  Q.   You understand you're here appearing in
23  your personal capacity, as Mr. Vashaw, and also a
24  representative on behalf of Spangler?

Page 8

1   A.   **Yes.**
2   **(Court Reporter marked
3   Defendant's Exhibit 7.)**
4   **MR. STRAND:** And I'll show you
5   what's been marked as Exhibit 7 for this
6   deposition.
7   And for the record, this is
8   Defendant Tootsie Roll Industries' First
9   Notice of Rule 30(b)(6) Deposition of
10  Spangler Candy Company.
11  **BY MR. STRAND:**
12  Q.   Have you seen this before?
13  A.   **I don't know that I have.**
14  Q.   And I'll have you turn to about four
15  pages in.  There's something attached that says
16  Schedule A on the top.
17  A.   **Okay.**
18  Q.   I was just wondering if you'd seen the
19  topics that are listed at the bottom of this page and
20  the next.
21  A.   **Yes.  I think I've seen, maybe not this
22  exact list, but something very similar.**
23  Q.   Okay.  And in order to testify on behalf
24  of Spangler today, did you talk with any individuals

Page 25

1  following that I don't think any of the other
2  lollipops have.
3        I mean, they have some more flavors, but
4  ours is a well-known brand, and people -- people
5  remember the flavors from being kids. So there's that
6  kind of a nostalgic attribute of the brand so ...
7     Q.   Anything else?
8     A.   The question was --
9     Q.   The --
10    A.   The question what sets Dum-Dums apart
11  from the other ones?
12    Q.   In particular from Charms Mini Pops.
13    A.   I think our quality is better. The
14  manufacture -- I believe the manufacturing process is
15  different, and so we have a higher quality. The pop
16  itself is higher quality. I think -- so those are the
17  main ones.
18    Q.   What -- forgive my ignorance on this.
19  But what sets apart -- what do you consider to be a
20  high quality mini pop versus a lower quality mini pop?
21    A.   The opaqueness of it. I believe
22  lollipops should be opaque and not as translucent.
23  And our Dum-Dums are more opaque, so there's more kind
24  of color to them.

Page 26

1        In my opinion, the Tootsie Pops -- or
2  excuse me, the Charms Mini is more translucent. So
3  you can kind of look into the pop, so it looks
4  cheaper. This is just my kind of personal -- this is
5  my opinion.
6        Certainly the easy -- the ease of
7  opening the wrap is a very important attribute for
8  Dum-Dums. And I think, again, for the other
9  lollipops, wraps that are hard to open makes it a
10  lower quality product in the eyes of consumers, in my
11  opinion.
12    Q.   And the ease of the opening wrap is
13  caused due to the -- what Dum-Dums refers to as its
14  sashay-type wrap?
15    A.   Correct, correct.
16    Q.   And, if anything, what are the
17  competitive differences between the Chupa Chups pops
18  and Dum-Dums?
19    A.   I don't think Chupa Chups are allergen
20  free. I don't know that for a fact. Chupa Chups
21  wraps are definitely very hard to open. Chupa Chups
22  doesn't have the brand awareness in the United States
23  that Dum-Dums do, so people are not as familiar with
24  the flavors.

Page 27

1     Q.   How do you perceive Chupa Chups'
2  quality?
3     A.   I think the look -- you know, it's been
4  a while since I actually looked at one of the pops,
5  because they're not widely distributed.
6        But I think the pop itself is similar in
7  terms of its appearance. So, again, I would give
8  Chupa Chups, in terms of quality, the wrap is very
9  difficult to open, like I said.
10    Q.   Are Chupa Chups sold in some same stores
11  as Dum-Dums?
12    A.   Not a lot. They do not have much
13  distribution.
14    Q.   But there are some competitive overlap?
15    A.   Yes, some, but it's very little.
16    Q.   Does Spangler know what percentage of
17  Dum-Dums' consumers actually see the bag in which
18  Dum-Dums come?
19    A.   Can you define "consumer"?
20    Q.   Sure. So I know when I go to the bank
21  or go to get my hair cut and my son gets his hair cut,
22  there's Dum-Dums there, and I never see the packaging
23  it comes in besides the wrapper, obviously, the actual
24  bag. And I consider myself the consumer of the pop --

Page 28

1     A.   Right.
2     Q.   -- because it's there. What
3  percentage -- do you know what percentage of people
4  actually consuming the end pop actually see the bags?
5     A.   I mean, I don't know that. I would just
6  be guessing. We consider consumers the people that
7  are actually paying money to buy the bag itself, of
8  which then -- or the product.
9     Q.   Uh-huh.
10    A.   And, you know, probably, I don't know, I
11  think you'd have to look at the numbers in here. But
12  roughly 80 percent or above of our total Dum-Dums
13  sales are in that kind of traditional red bag.
14        We have some other items that are not
15  necessarily in bags, but they're similar -- similar
16  look to the bags.
17    Q.   Like the boxes?
18    A.   Yeah, the boxes, and we have some tubs,
19  and I think they look -- they were listed in here,
20  like a thousand-count tub. It's not a bag, but it's
21  got a similar -- similar look to it.
22        So for the people that actually purchase
23  it, it's, you know, above 80 percent, I think, would
24  recognize kind of the look -- the look of Dum-Dums.

Page 33

1  kind of business type of candy.  So we sell our
2  lollipops, Dum-Dums, Saf-T-Pops.  We also sell some
3  other types of called give-away candy.  Smarties is
4  one of those.  We sell mints, things like that.
5      Q.    Okay.
6      A.    That's not so much -- that's not so much
7  a partnership versus we just buy product from them to
8  resell it on our website.
9      Q.    Gotcha.  Anyone else you can think of in
10 the hard candy area that uses red, besides Smarties?
11     A.    I can't think of any.  I mean, I
12 wouldn't be surprised if there is somebody, but I
13 don't -- I can't think of it off the top of my head.
14     Q.    And candy, generally, you understand
15 that there's other companies that use red as their
16 packaging --
17     A.    Yes.
18     Q.    -- such as Twizzlers --
19     A.    Twizzlers, yes.  Skittles.
20     Q.    Kit-Kat.
21     A.    Is Kit-Kat red?  I know that there are,
22 yes.
23     Q.    Maybe not the same Pantone color of red,
24 but a red shade.

Page 34

1      A.    Yeah, of course.
2            MR. STRAND:  Go to interrogatory
3  No. 2 response on page 3 of Exhibit 8.
4            And just for ease, too,
5  actually ...
6            (Court Reporter marked
7  Defendant's Exhibit 9.)
8  BY MR. WICKLUND:
9      Q.    Mr. Vashaw, you've been handed what's
10 been marked as Exhibit 9, and this is a document that
11 was filed along with Spangler's motion for preliminary
12 injunction as a document at ECF 17-2 in this matter.
13           Do you recognize this as your
14 declaration?
15     A.    Yes.
16     Q.    And then there is a series of exhibits
17 appended to your declaration.
18     A.    Yes.
19     Q.    And -- okay.  We'll get back to that,
20 but I just wanted to have images of the products
21 before us while we get back into this next line of
22 questioning.
23     A.    All right.
24     Q.    If you need them, they're there.

Page 35

1            Going back to interrogatory No. 2 of the
2  response, Exhibit 8, in the middle of the paragraph
3  there is a sentence that says:  "The combination of
4  the color of the bag, location of the display window,
5  and location, shape, and color of the oval with
6  numerals has been used consistently since the update
7  of its trade dress in 2011, and they create a
8  distinctive trade dress that has become identified
9  with Dum-Dums."
10           Do you see that?
11     A.    Yes.
12     Q.    Is that an accurate description of
13 the -- what Spangler contends is the trade dress of
14 its Dum-Dums packaging?
15     A.    Yes.  I think there's probably some
16 other elements that you could maybe include in there,
17 but those are the main ones, yes.
18     Q.    So looking at Exhibit A to your prior --
19 your declaration -- if you need me to staple that, let
20 me know.
21     A.    Okay.  I'm good.
22     Q.    In this Exhibit A to your declaration,
23 which is Exhibit 9 to this deposition, this shows what
24 I'll call the older trade dress of the Dum-Dums

Page 36

1  packaging from roughly 1995 to roughly 2010.
2      A.    (Witness nods head.)
3      Q.    Is that correct?
4      A.    Yes.
5      Q.    And on this packaging, there is what is
6  referred to as a blue ribbon with a yellow outline
7  running across the bag with multicolored dots in it.
8      A.    Yes.
9      Q.    And that was on all the packaging that's
10 shown on this image?
11     A.    Yes.
12     Q.    And then if you turn to Exhibit B,
13 Dum-Dums or Spangler has continued to use such trade
14 dress with a blue ribbon running across it with a
15 yellow outline and differently formatted multicolored
16 dots, but multicolored dots roughly within that blue
17 frame.
18     A.    Yes.
19     Q.    And that's consistently used on its
20 packaging for Dum-Dums?
21     A.    Yes.
22     Q.    But you're not describing that as part
23 of the trade dress of Dum-Dums in response to
24 interrogatory No. 2?

1   A.   No.  We didn't list it.  That is part of
2  our trade dress, as is, I think, the little drum man.
3  We've used him pretty consistently, maybe not a
4  hundred percent, but generally we put him on the -- on
5  the bags.  So that's part of -- to me that's part of
6  the trade dress as well.
7   Q.   The drum man, he doesn't have a name,
8  does he?
9   A.   The Drum --
10   Q.   The Drum Man.
11   A.   The Drum Man.
12   Q.   You should have had a name for him at
13  some point.
14   A.   I know.  I know.  We've been talking
15  about it.
16   Q.   Now, in Exhibit B to your declaration,
17  looking at the packaging, there is also what I'll call
18  a triangle of blue in the upper left-hand corner with
19  a number indicating the number of flavors within the
20  bag.
21   A.   Yes.
22   Q.   And I know it's not a perfect triangle,
23  just a general shape there.  And that blue triangle is
24  used on all the packaging showed on Exhibit B for

1  Dum-Dums, correct?
2   A.   Yes.
3   Q.   Okay.  And is that also part of the
4  trade dress of Dum-Dums?
5   A.   Yes.  That's part of it, yes, part of
6  the design.  It's all together part of the trade
7  dress, I think.
8   Q.   And you didn't identify that as part of
9  the trade dress in response to interrogatory No. 2?
10   A.   No.
11   Q.   And looking at that sentence, in
12  response No. 2, when you say "the combination of the
13  color of the bag," the color you're referring to there
14  is red, I'm assuming?
15   A.   Yes.
16   Q.   "Location of the display window," is
17  that roughly in the bottom half of the bag?
18   A.   Yes.
19   Q.   "And location, shape, and color with
20  numerals," I'm assuming location is generally on the
21  lower right-hand side?
22   A.   Yes.
23   Q.   Except in the 500 bag, where it's in the
24  center?

1   A.   Correct.  And the 500 count is in the
2  center, because the consumer wouldn't see it otherwise
3  because of the display case if it was on the -- all
4  the way over.
5   Q.   Because of the --
6   A.   Just the design of the case.
7   Q.   The cardboard case in which these are
8  displayed has sides on it that prevent you from seeing
9  the sides of the bag?
10   A.   Correct.
11   Q.   And when you're referring to the shape,
12  what shape are you referring to?
13   MR. WICKLUND: Shape of --
14  BY MR. STRAND:
15   Q.   "Shape and color of the oval," I'm
16  assume you're referring to the oval shape?
17   A.   Yes.
18   Q.   And color being generally yellow-ish?
19   A.   Yeah.  The blue on the yellow, yes.
20   Q.   The blue type on yellow?
21   A.   Yeah.
22   Q.   I don't see any mention there of the
23  coloring of the Dum-Dums name.  Is the white lettering
24  of the Dum-Dums name part of the trade dress of -- the

1  Dum-Dums trade dress?
2   A.   Yeah.  That's our logo, so, you know,
3  we're very consistent with how we use that -- that
4  logo and the shadowing of the logo.  But, yeah, it all
5  goes together as part of the trade dress.
6   Q.   And the color white of that lettering
7  would be one aspect of the trade dress?
8   A.   I'm just trying to think where we've
9  used applications as a Dum-Dums brand where we didn't
10  use the white, and I can't think of any, except maybe
11  on some -- perhaps on the display case we've used a
12  different color when we've had to.
13   But for the most part, when we use the
14  red packaging, we use the white Dum-Dums logo.
15   Q.   And we'll get more into this later, but
16  there are instances in which Dum-Dums are sold without
17  the red packaging; for instance, on holidays.
18   A.   Yes.  It's -- it's usually when we have
19  a different flavor mix within the bag.  But most, if
20  not all the time, it's just single -- our standard
21  mix, traditional mix of the 16 flavors, we put it in
22  the red bag.
23   We use other colors when it's a
24  different type of flavor mix, which could be

Page 41

1   seasonally.
2       Q.    The next sentence, I believe, states --
3   and this is again in the interrogatory response.
4       A.    Uh-huh.
5       Q.    "Before Tootsie introduced its new
6   packaging, Spangler's Dum-Dums bag was the only
7   lollipop bag that used this color scheme and locations
8   of graphic elements."
9             Do you see that?
10      A.    Yes.
11      Q.    And when you say Tootsie's new packaging
12  there, you're referring to the packaging that's shown
13  in Exhibit F in your declaration, the
14  Charms Mini Pops?
15      A.    Yes.
16      Q.    And then Exhibit C to your
17  declaration -- I apologize for going back and forth
18  here -- you have some examples at the top there.  You
19  say Trade Dress Examples.
20            Do you see that?
21      A.    Yes.
22      Q.    And besides the Tootsie Pops Miniatures
23  that's shown there, are any of the other pops you have
24  displayed there mini pops?

Page 42

1       A.    I don't know about the original gourmet
2   ones, but there may be.  I don't know for sure.  But,
3   no, these other ones are -- I believe, are not
4   miniature pops.
5       Q.    And for both the Tootsie Pops and
6   Tootsie Pops Miniatures, the window in those bags you
7   show there are in the lower portion of the bag,
8   correct?
9       A.    Yes.
10      Q.    And then in the Tootsie Pops Miniatures,
11  there is an oval that says "200 Pops" in it in the
12  lower right-hand corner, correct?
13      A.    Yes.
14      Q.    And though I believe the color is
15  distorted here, at least portions of the writing for
16  Tootsie Pops Miniatures is in white on the packaging.
17      A.    Yes.
18      Q.    And do you know what color the half
19  circle on which "Tootsie Pops Miniatures" is placed
20  is?
21      A.    I'm going just from this picture.  It
22  looks like it's a red.
23      Q.    Okay.  And then there's also in the
24  Caramel Apple Pops a window in the lower portion of

Page 43

1   the bag?
2       A.    Yes.
3       Q.    And same with Original Gourmet
4   Lollipops.
5       A.    Yes.
6       Q.    And Jolly Rancher, Tootsie Pops,
7   Blow Pops, Tootsie Pops Miniatures and Original
8   Gourmet Lollipops all use white lettering as part of
9   the packaging for those names?
10      A.    Yes.  Their logos all have white.
11      Q.    Is there a purpose for the window on the
12  packaging of Dum-Dums?
13      A.    Is there a purpose?
14      Q.    Sure.
15      A.    Yes.  It's just so consumers can see
16  the -- so they can see the pops, they can see the
17  variety of flavors.  It's also a little bit of the
18  design element of just, again, showing the product,
19  showing the actual product to the consumer.
20      Q.    And the -- the product which has the
21  sashay wrap on it, you consider that itself to be
22  trade dress of Spangler, correct?
23      A.    The sashay wrap, yes.
24      Q.    And you can see that through the window

Page 44

1   with -- in the Dum-Dums packaging.
2       A.    Yes.
3       Q.    And that would be identifiable --
4   identifiable just as myself who may only see the pops
5   at the salon or bank?
6       A.    Yes.  I mean, it's a little hard to see
7   in there, but you can -- you can see them.
8       Q.    I'll just have you go to interrogatory
9   No. 5, which is on page 4 of Exhibit 8.
10      A.    Okay.
11      Q.    Take a moment and read that to yourself
12  so you're familiar.
13      A.    Yes.
14      Q.    And you signed these back on September
15  30th.  Since that day, has Spangler become aware of
16  any actual complaints of consumer confusion from
17  retail customers?
18      A.    I don't know of any complaints from
19  retail customers.
20      Q.    Do you know of complaints from other
21  customers?
22      A.    No.  If you're asking -- we don't
23  have -- no.
24      Q.    So as of now, Spangler doesn't have any

Page 57

1 just let you first take your time on your own just to
2 review that response so you're familiar with it.
3     A.    Okay. I kind of glanced at it quick.
4     Q.    Sure. This is from September 30th, and
5 I'm just wondering if there is any other facts
6 supporting Spangler's allegation it's been damaged by
7 Tootsie's use of the accused packaging for its Charms
8 Mini Pops besides what's listed here.
9     A.    Well, we're in the Halloween period now,
10 so we are having our -- we're looking for the
11 distribution of the Charms Mini. And I don't know if
12 we captured all of them in here, but I know there's
13 been, I think, Hy-Vee -- I guess that's already listed
14 in here.
15          We're asking our sales team, If you see
16 this Charms Mini item, let us know; and so we're
17 getting those in. I don't know if they're more than
18 we've already listed here or not.
19     Q.    I'm assuming Halloween period is a
20 relatively large buying period for Dum-Dums.
21     A.    Yes.
22     Q.    And you have separate packaging for
23 Halloween for Dum-Dums as well?
24     A.    It depends. Generally, no. For the

Page 58

1 most part, most of what we sell is the red bag.
2 Sometimes we do a specific flavor mix, especially when
3 retail customers say they want a Halloween look, and
4 so then we'll -- we'll change the bag color.
5          But I'm guessing -- I'm guessing over 90
6 percent of it is in the red bag.
7     Q.    This year is there a -- does Spangler
8 offer a Halloween-look bag for its Dum-Dums?
9     A.    Yes.
10     Q.    And at what outlets, to your knowledge,
11 is that being sold?
12     A.    I -- I don't know for sure. I would
13 have to go look it up.
14     Q.    And would it be your estimation,
15 consistent with what you just said, I just want to
16 confirm, that about 10 percent, you're estimating, of
17 your sales will be of that type of bag versus the red
18 bag this year?
19     A.    That would be on the high side. I'm
20 pretty sure it will be less than 10 percent.
21     Q.    You specifically called it Hy-Vee. Why
22 did you call it Hy-Vee?
23     A.    Just a second ago.
24     Q.    Yes.

Page 59

1     A.    I just happened to remember it. Someone
2 from our sales team said, Hey, I saw it in Hy-Vee.
3     Q.    Gotcha.
4     A.    I see it was already listed here.
5     Q.    For -- in response to interrogatory
6 No. 12, part 1, subpart a. there, talking about retail
7 Party City.
8     A.    Uh-huh.
9     Q.    Do you know, first of all, is Party City
10 using the red bag -- or was it using a red bag, or was
11 it using a Halloween bag?
12     A.    They were using the red bag, I've
13 very -- I'm pretty sure of that.
14     Q.    And did they tell Spangler why they
15 replaced the 300-count Dum-Dums with Charms Mini Pops
16 on the account?
17     A.    I -- I don't know. I was -- I wasn't on
18 that call.
19     Q.    Do you know if Charms Mini Pops were
20 sold to retail Party City for less than Spangler was
21 offering its Dum-Dums?
22     A.    I don't know.
23     Q.    Do you know if the coloring of the
24 Charms Mini Pops bag had any influence on the buyer at

Page 60

1 Party City?
2     A.    I don't know. I haven't talked to the
3 buyer.
4     Q.    And part b., talking about Sam's Club
5 buyer.
6     A.    Yes.
7     Q.    Actually, before we get to that. When
8 typically do retailers place orders for Halloween --
9 well, strike that. Let me ask a foundation question
10 for that.
11          Do most retailers make a separate larger
12 purchase for the Halloween time period?
13     A.    Yes.
14     Q.    Okay. And when generally do they place
15 that type of order?
16     A.    I want to say the May -- the May/June
17 time period, roughly. It depends on the retailer.
18 Some people are further out, but probably on average
19 it's in that range.
20     Q.    Going back to 1b., did the Sam's Club
21 buyer convey to Spangler why it would perform the test
22 of Charms Mini Pops?
23     A.    Yes.
24     Q.    Why?

Page 61

1    A.    He said that -- that they did have a
2 better value than us, that they -- he said that they
3 were selling the 600 count for the same -- either the
4 same or similar price as our 500 count; and he thought
5 that the bags looked the same; and he thought that
6 people wouldn't notice the difference in the brands;
7 and he thought -- he said he thought people might be
8 confused, but they might not care, and they'd have to
9 see how many complaints that they got.
10    Q.    What is the gentleman's name, the
11 Sam's Club buyer?  Or woman, sorry.
12    A.    It will come to me.  David.  Bingham.
13    Q.    Bingham?
14    A.    David Bingham.
15    Q.    So he did convey to Spangler that he
16 thought one of the reasons they were going to do the
17 test was because the bags were similar looking?
18    A.    Yes.
19    Q.    But also the fact that they were a
20 better value because of the pricing at the 600 versus
21 500?
22    A.    Yes.
23    Q.    I'm assuming value is something that
24 most retail buyers take into consideration?

Page 62

1    A.    Yes.
2    Q.    And value is something that the end
3 consumers also take into consideration?
4    A.    Yes.
5    Q.    And it's not unusual for your
6 competitors to sometimes be cheaper or undercut the
7 Dum-Dums pricing.
8    A.    Yes.  Most of -- you know, Charms Mini
9 has been below our pricing for a long, long time, as
10 well as some of the imported mini pops that I
11 mentioned before.  They're almost always below our
12 price.
13        But when we talk about value, value is
14 also the brand perception, so it's not just about
15 price.  When I say value, it's about the whole of what
16 the consumer is getting.  Prices -- I think about
17 price differently than value.
18    Q.    Can you explain to me, not being a
19 company person, referring to here with the Sam's Club
20 Halloween Promotional Accrual of 350,000 dollars, what
21 does that refer to?
22    A.    So we have to, in order to get
23 merchandising in the front of the store at Halloween,
24 which is a key spot, merchandising spot, you have to

Page 63

1 pay Sam's money, and so it's 350,000 dollars a year.
2 Sam's -- does that answer your question?
3    Q.    And does that mean the -- when you say
4 "the front of the store," I'm thinking that -- I don't
5 know if I've been to Sam's in a while; but Costco, you
6 immediately enter, and there's a spot where there's
7 stuff that could be further back in the store, but
8 it's promotional, it seems like.
9    A.    Correct.
10    Q.    Okay.  And so Spangler was paying Sam's
11 350,000 dollars a year in order to get Dum-Dums
12 packaging up towards -- in that area?
13    A.    Correct.
14    Q.    Okay.  And then what is it referring to
15 here as the reduction, the 10 percent reduction
16 request?
17    A.    So Sam's closed about 10 percent of
18 their stores last year, since Halloween of 2017, so we
19 wanted to, of course, go in and say, hey, the
20 promotion should -- we should pay 10 percent less,
21 because there's 10 percent less stores.  That's where
22 the 10 percent comes from.
23    Q.    Gotcha.  Are Dum-Dums sold at Costco?
24    A.    Not currently, no.

Page 64

1    Q.    Are they sold at BJ's?
2    A.    Yes.
3    Q.    Do you know if Charms Mini Pops are sold
4 at Costco?
5    A.    Yes.
6    Q.    They are sold at Costco?
7    A.    I believe they are, yes.  At their
8 Costco business centers.
9    Q.    And the -- do you know if they're sold
10 at BJ's?
11    A.    Charms Minis?
12    Q.    Correct.
13    A.    I'm pretty sure they're not.  I would
14 have heard about that.  As I say, I don't know for
15 sure, but I don't think so.
16    Q.    Prior to Charms launching its new
17 packaging, had Spangler lost retail accounts to
18 Tootsie in the past?
19    A.    To Charms --
20    Q.    To Charms.
21    A.    -- Mini?
22    Q.    Yeah, to Charms Minis.
23    A.    The only -- the only place that I think
24 that that happened was at the Costco business centers.

Page 77

1  doing that, if I could ask you to --
2  perfect.  Thank you.
3  Do you know where the front of
4  your declaration went?
5  THE WITNESS: That's it.
6  BY MR. STRAND:
7  Q.  If you turn to paragraph 7 of your
8  declaration, which is Exhibit 9 of this deposition.
9  Do you have any -- in the middle here of
10  the paragraph, you state, quote, Consumers often do
11  not scrutinize packaging closely for details
12  concerning the product before selecting for purchase.
13  Do you see that?
14  A.  Yes.
15  Q.  Do you have data on how long consumers
16  look at packaging of Dum-Dums before purchasing?
17  A.  I don't have data.  Just from my
18  experience we know it's not very -- it's not very
19  long.
20  I learned back in business school that
21  it's -- and Sam's Clubs had something called the
22  5-by-5.  So people have -- they're looking at
23  something from 5 feet away, and you've got to
24  communicate what you need to in 5 seconds, because

Page 78

1  that's all you have.
2  So that's -- but is there data on that?
3  I haven't seen that, but I think that's a widely kind
4  of accepted kind of fact about consumer behavior.
5  Q.  And later on in that paragraph, you
6  state: "That is why the font of the packaging text
7  tends to be very small and arranged in a manner that
8  does not  really require the consumer read the
9  packaging," and goes on from there.
10  A.  Yeah.
11  Q.  When you're talking about the text being
12  very small, you're not referring to Dum-Dums text, I'm
13  assuming.
14  A.  The brand, the logo?
15  Q.  Correct.
16  A.  No.
17  Q.  And you consider that to be large?
18  A.  Yes.
19  Q.  Okay.  And would you say the same for
20  the Charms Mini Pops brand?
21  A.  Yes, yes.
22  Q.  On paragraph 8 towards -- on page 4, it
23  states: "Spangler reviewed over 35 designs and
24  consumer tested the top four to determine which one

Page 79

1  was most distinctive and acceptable to consumers."
2  Do you see that?
3  A.  Yes.
4  Q.  And what did -- what does "most
5  distinctive" to you mean there?  What do you mean by
6  that?
7  A.  I think it was -- it was the one that
8  kind of communicated all the elements of the brand the
9  best.
10  Q.  And paragraph 11 states, "Spangler's
11  trade dress for its Dum-Dums lollipops is distinctive,
12  particularly in the market for lollipops, and it
13  indicates to the consuming public the source or origin
14  of the product."
15  Do you think Spangler's trade dress for
16  Dum-Dums, in particular its red bag, is distinctive in
17  the candy field in general?
18  A.  yeah.
19  Q.  What aspects of it do you believe make
20  it distinctive for candy?  In the candy field, excuse
21  me.
22  A.  Well, I guess I say that because I think
23  about a consumer looking at the shelf, and you would
24  see our bag from a distance and know that's Dum-Dums

Page 80

1  lollipops, as opposed to any other of the candies,
2  including chocolate.
3  Q.  Including chocolate?
4  A.  Yeah, I can't -- of course, we compete
5  more in the non-chocolate space.  But I can't think of
6  a chocolate candy that looks like ours either.
7  Q.  And you compete in the hard candy space
8  as well?
9  A.  Yes.
10  Q.  Later on in this paragraph you state
11  it's only lollipop bag whose primary color was red.
12  Do you have a definition for what you
13  mean by "primary"?
14  A.  To me, that definition is
15  self-explanatory.  It means there's more of that color
16  than any other colors.
17  Q.  Okay.  In paragraph 16, skipping ahead a
18  little bit, first, when in 2018 was Spangler alerted
19  by a buyer about the statement made there in 16?
20  A.  And the question is?
21  Q.  Sure, when in 2018.
22  A.  It was the beginning part of the year.
23  In fact -- I can't remember the exact time.  I
24  remember it was from a Walgreens buyer.  But that's

Page 85

1    Q.    Was that in-person, or was that over the
2 phone or --
3    A.    That was in-person.
4    Q.    Okay.  The terms "sales call" always
5 throws me off.
6    A.    Okay.
7    Q.    Where is the buyer for Sam's Club
8 located?
9    A.    Bentonville, Arkansas.
10    Q.    Who attended that meeting on Spangler's
11 behalf?
12    A.    It was myself, Evan Brock,
13 Glenn Hudspeath, I think Jeff Devlin was there.  There
14 was four.
15    Q.    And when did that meeting occur?
16    A.    It was the beginning of May.
17    Q.    When was the first time that -- I'll ask
18 you personally first.
19    A.    Uh-huh.
20    Q.    When is the first time you saw the new
21 packaging for the Charms Mini Pops bag?
22    A.    It was sometime in mid winter, I think.
23 So does that answer your question?
24          I don't remember the precise time.  I do

Page 86

1 remember when I did see it, I just remember thinking
2 that Brian Rinker was -- was right.
3    Q.    Brian Rinker being --
4    A.    Being the Walgreens buyer.  Because he
5 had just -- that was what he had said, and I do
6 remember thinking that.  I just don't remember the
7 exact -- exact date.
8    Q.    Do you remember the circumstances under
9 which you saw the new packaging?
10    A.    I think I saw it by e-mail.
11    Q.    When was the first time that -- strike
12 that.
13          In this -- did Brian Rinker ever show
14 anyone at Spangler the updated Charms Mini Pops bags?
15    A.    I don't think so, no.  I wouldn't expect
16 him to.
17    Q.    Who is the -- when was the first time
18 that Spangler saw the revised Charms Mini Pops bag?
19    A.    Again, I think it was sometime in the
20 winter.  I can't remember the exact circumstance.  One
21 of our sales folks -- I don't know if they saw it at
22 one of the ECRMs but -- and that's how we got a
23 picture of it.  Or I can't remember exactly how we got
24 the photo but ...

Page 87

1    Q.    Would it have been after the Walgreens
2 meeting?
3    A.    Oh -- oh, yes, definitely.
4    Q.    So the -- the alert that's described in
5 paragraph 16 of your declaration from Walgreens, that
6 was the first instance that Spangler heard about the
7 revised bags, the revised Charms bags?
8    A.    Yeah, that's correct, yeah.
9    Q.    And at 19 of your declaration -- sorry,
10 if you don't mind me helping you out a little bit
11 here, I'm just going to slide these under here.  I
12 should have stapled these all.
13    A.    I'm sorry.  19?
14    Q.    Correct.
15    A.    Okay.
16    Q.    You state in the second sentence:  "For
17 many years, Tootsie and Spangler sold Charms Mini Pops
18 and Dum-Dums, respectively, using similar yellow
19 pallet boxes with a U-shaped cut-out to display the
20 bags of product inside the ballot box."
21          I assume that should be "pallet box."
22    A.    Yes.  I'm not sure exactly what that --
23 "inside the case," that's probably what it should have
24 been.

Page 88

1    Q.    And you recognize that Tootsie has sold
2 Charms Mini Pops and displayed them in yellow pallet
3 boxes for many years?
4    A.    Yes.
5    Q.    Do you know if it was doing that before
6 Spangler was using yellow boxes for its Dum-Dums?
7    A.    I don't know.  I guess when I -- well, I
8 think we've been -- I guess by definition, we would
9 have to have done it first, because I don't think the
10 Charms Minis came out until after 2000, and I know
11 that we were already using the yellow box since then.
12    Q.    Do you know if Tootsie was using yellow
13 pallet boxes with the U-shaped cutout for any of its
14 other products prior to Spangler using the yellow
15 pallet box?
16    A.    I don't know.
17    Q.    When was the last time you reviewed the
18 entirety of this declaration?
19    A.    I read it the other day.
20    Q.    When you read it the other day, did you
21 come across anything that you thought needed to be
22 corrected?
23    A.    No.
24    Q.    In paragraph 20, on the last page, there

Page 89

1  is a reference to a representative of a large retail
2  customer.
3     **A.   Yes.  Okay.  Like the fourth sentence?**
4     Q.   Fourth line, at least.
5     **A.   Fourth line, yes.  Okay.**
6     Q.   Who is that, which large retail
7  customer?
8     **A.   That's Sam's Club.**
9     Q.   Did the buyer -- I think -- I forget
10 whether you said this or not.  But did the buyer
11 actually say that he hoped consumers would be
12 confused?
13    **A.   He didn't say he "hoped."  He thought**
14 **they might be confused, and that they -- he expected**
15 **to get some complaints, but that they would measure**
16 **the amount of complaints, and that he -- well, that's**
17 **what he said.**
18    Q.   Okay.  Did he say this to you in
19 writing, or was this orally?
20    **A.   It was orally.**
21    Q.   Did anyone take contemporaneous notes
22 from this meeting?
23    **A.   Did I?**
24    Q.   Did anyone at Spangler.

Page 90

1     **A.   Yeah.  I probably took some -- yes.  We**
2  **probably all took notes.**
3        **MR. STRAND:** You can put that back
4        together and set it aside for now.  I'll
5        clean up a little bit.
6        (Court Reporter marked
7        Defendant's Exhibit 10.)
8  **BY MR. STRAND:**
9     Q.   I'm handing you what's been marked
10 Exhibit 10, which was produced in this litigation as
11 Spangler 00018 through 20.  And just, if I haven't
12 said this already, Mr. Vashaw, there's numbers at the
13 bottom that I'll represent to you is production,
14 sometimes as Bates number, that are on every single
15 piece of paper in this litigation, and just for ease
16 of reference.
17    **A.   Okay.**
18    Q.   First, what is Exhibit 10?
19    **A.   This appears to be all of our trademarks**
20 **that we have.**
21    Q.   Do you know if it's all of Spangler's
22 trademarks, or is it just the trademarks related to
23 certain lines or --
24    **A.   This looks like all of our trademarks.**

Page 91

1     Q.   And this is all the registrations, not
2  necessarily -- this is all the registrations?
3     **A.   Correct.**
4     Q.   You believe -- Spangler, I'm assuming,
5  believes it has other trademarks that may not be
6  registered?
7     **A.   Yes.  These are the registered**
8  **trademarks.**
9     Q.   And the -- do you understand trade dress
10 can be registered with the United States Patent and
11 Trademark Office?
12    **A.   Yes, I do understand that.**
13    Q.   Okay.
14        (Court Reporter marked
15        Defendant's Exhibits 11 and 12.)
16        **MR. STRAND:** I'm handing you
17        what's been marked as Exhibits 11 and
18        12.
19        For the record, 11 is a printout
20        of registration No. 3397436, and Exhibit
21        12 is a U.S. registration trademark No.
22        1535574.
23 **BY MR. STRAND:**
24    Q.   And the Exhibit 11 is the registration

Page 92

1  for the -- what we have referred to as the sashay wrap
2  of the Dum-Dums pop earlier.
3     **A.   Yes.**
4     Q.   And then the other one is a registration
5  for the handle of the Saf-T-Pop that Spangler
6  manufactures?
7     **A.   Yes.**
8     Q.   Does Spangler have any registration on
9  the alleged trade dress for its Dum-Dums packaging?
10    **A.   I don't believe so.**
11    Q.   Do you know why not?
12    **A.   Well, I'm not a lawyer, but I know the**
13 **problem is when you do that, you make a slight change,**
14 **you have to keep refiling it.  So, you know, there's**
15 **just a practical nature.  You know, we're changing the**
16 **weight and the ingredient statement and things like**
17 **that all the time.**
18        **And, you know, you'd have to keep**
19 **refiling, and we have so many different SKUs -- I**
20 **don't know how many total SKUs we have, you'd have to**
21 **file -- but my understanding is you'd have to file one**
22 **for every bag design and every configuration, and**
23 **there would be dozens of those that you would**
24 **constantly have to be updating.  So I believe that's**

Page 93

1　why we haven't done it before.  And I believe that's
2　most people don't do that for that -- for that very
3　reason.
4　　　Q.　Besides Mr. Wicklund's firm, does
5　Spangler use any other firm for its trademark
6　prosecution in the United States?
7　　　A.　Not that I know of.
8　　　　　MR. WICKLUND: John, I'm going to
9　take a little break.  I want to check
10　and make sure lunch is here.
11　　　　　MR. STRAND: Why don't we just go
12　off the record.
13　　　　　THE WITNESS: Very important.
14　　　　　THE VIDEOGRAPHER: We're now going
15　off the record.  The time is 11:36 a.m.
16　　　　(A brief recess was had.)
17　　　　　THE VIDEOGRAPHER: We are back on
18　the record.  The time is 11:43 a.m.
19　　　　(Court Reporter marked
20　Defendant's Exhibit 13.)
21　BY MR. STRAND:
22　　　Q.　Mr. Vashaw, you've been handed what's
23　been marked as Exhibit 13.  It's Spangler 25 through
24　33.

Page 94

1　　　And what is this document?
2　　　A.　This looks like it's IRI data showing
3　the latest 52 weeks of sales for the U.S.
4　　　　　MR. WICKLUND: Just for the
5　record, because of our understanding
6　with IRI, I want to designate this
7　attorney eyes only.
8　　　　　MR. STRAND: Okay.
9　BY MR. STRAND:
10　　　Q.　And I'm assuming you reviewed data such
11　as this as a part of your job duties --
12　　　A.　Sure.
13　　　Q.　-- as CEO at Spangler.
14　　　A.　Yes, yes.
15　　　Q.　You've seen it before, seen this before?
16　　　A.　Yes.
17　　　Q.　And this is the one that -- ending in
18　August 12th, 2018?
19　　　A.　Okay.  Yes.
20　　　Q.　Is that true, based on your reading?
21　　　A.　Yes.
22



Page 95

Page 96





18  **MR. STRAND:** Let's take a break
19  for lunch.
20  **MR. WICKLUND:** MR. STRAND: Okay.
21  We're going to be in a different
22  conference room.  You're all invited.
23  **THE VIDEOGRAPHER:** We are going
24  off the record.  The time is 12:08 p.m.

1   (A luncheon recess was taken from
2   12:08 p.m. to 12:50 p.m.)
3   **THE VIDEOGRAPHER:** We are back
4   on the record.  The time is 12:50 p.m.
5   (Court Reporter marked
6   Defendant's Exhibit 15.)
7   **BY MR. STRAND:**
8   Q.   Good afternoon.
9   **A.   Good afternoon.**
10  Q.   I'll show you what's been marked as
11  Exhibit 15, which is marked Spangler 48 through 54.
12  And this appears to be an Amazon listing from
13  approximately August 28th, 2018, when the search
14  "Dum-Dums" is applied; is that right?
15  **A.   That's the way it looks, yes.**
16  Q.   Okay.  And do you know who the Diana is
17  that's mentioned at the top here above "Account"?
18  **A.   That would be Diana Moore Eschhofen, I'm**
19  **guessing.**
20  Q.   And the first image here of the Dum-Dums
21  spilling out of a brown box, that is a bulk box that
22  is sold by Spangler?
23  **A.   No.  That's -- I think this is A Great**
24  **Surprise -- this is someone that we've had an issue**

1   **with, has been reselling our product online.**
2   **So the first two items are not sold by**
3   **Spangler.  Although it's -- it says by "Dum Dums," but**
4   **it's not Spangler who makes that.**
5   Q.   Okay.
6   **A.   Those first two items.**
7   Q.   Do you know the name of that individual
8   or company?
9   **A.   Well, it's called A Great Surprise.  I**
10  **see the -- I think that's what the top one is, too.**
11  **Because we don't -- we don't have a 2.4 pound box.**
12  Q.   And then where are you getting the
13  name -- strike that.
14  I think you said the word "Great
15  Surprise" appears on one of these labels here; is that
16  correct?
17  **A.   Yeah.  I think it appears on both of**
18  **them.**
19  Q.   And do you recognize that label on the
20  bag as the, the second one here, as the Great Surprise
21  label?
22  **A.   Yes.**
23  Q.   Do you know if Great Surprise is located
24  in the United States or abroad?

Page 113

1    A.    I think they're in the United States,
2 because I think we've had some discussions with them
3 of not selling this item online.
4    Q.    Have you had -- have you sent any
5 cease-and-desist letters?
6    A.    I think -- I don't know the exact
7 correspondence that we've had with them. I just
8 don't. I don't know.
9    Q.    Have you sued them?
10    A.    I know we haven't sued them.
11    Q.    The bottom one here, though, that is the
12 red Dum-Dums bag that we have been talking about in
13 this case.
14    A.    Yes, yes.
15    Q.    And then if you turn to the second page,
16 the second item there, it says, "Light Blue Dum Dums
17 Color Party," what is that bag?
18    A.    So this is a line of single-color pops
19 that we have introduced. And so "Color Party," there
20 are -- they're individual colors in each bag. So that
21 happens to be the light blue bag.
22    Q.    And what other colors are offered by
23 Dum-Dums today?
24    A.    I believe it's like 13 different colors,

Page 114

1 somewhere in that range, roughly a dozen.
2    Q.    Are the bags between the different
3 colors any different besides the pops inside them?
4    A.    No. It's all the same graphics, and
5 then we use the window to differentiate the color.
6    Q.    Are the Color Party bags offered in any
7 other sizes between -- besides what I believe says
8 75 --
9    A.    75.
10    Q.    -- 75 count?
11    A.    No, not in -- no. There are some -- not
12 that we sell. There is an item that goes in a
13 particular set for Party City that has kind of
14 Party City typographics to match their set, but that's
15 sold to Party City. Everyone else is just sold the 75
16 count. I don't think we have any different SKUs for
17 that.
18    Q.    And then below there -- strike that.
19         That packaging that we see for the Color
20 Party bag, that is packaging that Dum-Dums currently
21 uses today.
22    A.    Yes.
23    Q.    And then below that, there's two
24 Dum-Dums bags that says Value Pack of two.

Page 115

1         Are each of those bags 20 count?
2    A.    Yes.
3    Q.    And is that trade dress or the format of
4 the bags that Dum-Dums uses today for those 20-count
5 bags? Strike that. Let me ask that clearer.
6         Does Dum-Dums still manufacture and
7 offer for sale 20-count-bag Dum-Dums?
8    A.    I believe so, yes.
9    Q.    Okay. And would that be the format of
10 the bag for the 20-pops bags today?
11    A.    I believe so.
12    Q.    And below that, there are additional
13 bags that say "Dum-Dums" on them. Are those official
14 Dum-Dums bags?
15    A.    Yes.
16    Q.    And does Dum-Dums still package pops in
17 bags that look like those?
18    A.    Those are only -- yes. Those are only
19 sold on the Internet. The ones that say "Favorite
20 Flavor," those are only sold on the Internet.
21    Q.    And I'm assuming they have one flavor in
22 them?
23    A.    Correct.
24    Q.    Do you sell any other flavors besides --

Page 116

1    A.    Cherry.
2    Q.    -- cherry?
3    A.    Yes. I don't know the exact number.
4 I'm guessing like eight.
5    Q.    So not all the flavors, just a subset of
6 them?
7    A.    Yes, I believe so.
8    Q.    And then is that a -- does Dum-Dums sell
9 a 30-pound box?
10    A.    Yes.
11    Q.    And is that roughly what it looks like
12 below there?
13    A.    Yes.
14    Q.    Obviously it's poured open and we can't
15 see the sides.
16    A.    Yes.
17    Q.    And does it have any red coloring on the
18 outside of the box, or is it just black?
19    A.    This particular one doesn't, no.
20    Q.    Are there any of the bulk boxes that do
21 have red on them?
22    A.    I guess the answer to that is no. We're
23 in the process of developing one, but not that's
24 currently for sale.

Page 117

1  Q.  Okay.  And then on top of the next page,
2  I'm assuming that's the Great Surprise?
3  **A.  That's a Great Surprise, yeah.**
4  Q.  Does Great Surprise, to your knowledge,
5  sell any other candy besides Dum-Dums?
6  **A.  I don't know that.  I'm guessing they**
7  **do, yes.**
8  Q.  How long has Spangler known that Great
9  Surprise is reselling Dum-Dums?
10  **A.  I might be off on my date.  I know we**
11  **talked about this last year, 2017 at least.**
12  Q.  And then below that is a Dum-Dums --
13  that's a 500-pack bag, correct?
14  **A.  Yes.**
15  Q.  And would that be somebody else
16  reselling it from Sam's Club, or does Dum-Dums sell
17  500-pound bags [sic] online as well?
18  **A.  I don't think we sell that online, and**
19  **it says by Dum-Dum's, apostrophe S.  It's tricky how**
20  **the online folks do it.  I think those are people**
21  **buying it from Sam's Club and reselling it.  I don't**
22  **think we sell that online ourselves.**
23  Q.  Okay.  At the very bottom of page 50,
24  there is a bag that says Dum-Dums Summertime

Page 118

1  Favorites.
2  **A.  Yes.**
3  Q.  Is that an official Dum-Dums bag?
4  **A.  Yes, it is.**
5  Q.  And does Dum-Dums sell that year round
6  or only during the summertime?
7  **A.  Just the summertime.**
8  Q.  And does -- it has less flavors than the
9  traditional Dum-Dums bag?
10  **A.  It has less flavors, and they're all**
11  **unique flavors to this particular bag.**
12  Q.  Okay.  So the flavors that are in that
13  are not offered within the traditional?
14  **A.  Correct.**
15  Q.  And is there a window on that Summertime
16  Favorites bag?
17  **A.  There is not.**
18  Q.  Is there a call-out as to the number of
19  pops or the weight of the bag?
20  **A.  The weight of the bag would be on there.**
21  **But this is -- this tends to be a smaller, so we don't**
22  **put the count on the smaller -- the smaller bags.**
23  **This has a metallic type of look to it,**
24  **which is why it doesn't have a window.  It's a -- you**

Page 119

1  **can't put a window in a metallic bag.**
2  Q.  And the weight that would be on here
3  would just be -- strike that.
4  Is there -- do you know what a violator
5  is?
6  **A.  Yeah.**
7  Q.  Is there a violator on here that
8  indicates the weight?
9  **A.  No.**
10  Q.  The weight would just be in the normal
11  small block --
12  **A.  Yes, exactly.**
13  Q.  -- at the bottom.
14  And just -- I'll remind us, just let me
15  finish my question before you answer.
16  Thank you.
17  And then up at the next page, looking at
18  the second one at the bottom, Dum-Dums Summertime, is
19  that an official Dum-Dums packaging?
20  **A.  Yes.**
21  Q.  And that's for a 250 count of Summertime
22  Favorites?
23  **A.  Correct.**
24  Q.  And there's no window on that bag, as

Page 120

1  well?
2  **A.  Correct, for the same reason.**
3  Q.  And then turning to the next page at the
4  top, can you describe what the top bag and box are?
5  **A.  Are we on page 50?**
6  Q.  Page 52.
7  **A.  This is -- oh, this is our Color Party.**
8  **And here -- I think this is sold through our**
9  **fulfillment center, I think, because they sell this by**
10  **the case.  So they're showing what's inside, and then**
11  **also the case that you're actually buying.**
12  Q.  And so there would be four 75-count
13  bags --
14  **A.  Exact --**
15  Q.  -- in that case?
16  **A.  Exactly.**
17  Q.  Sorry, just to remind you, let me finish
18  my question.
19  And then immediately below there,
20  there's a -- I'm going to call it a bucket.  Is that
21  an official Dum-Dums package?
22  **A.  Yes.  That's our older style, but yes.**
23  Q.  Do you still manufacture that style?
24  **A.  We manufacture the bucket, but not with**

Page 121

1 that -- that's old graphics.
2    Q.    So the graphics have changed on the
3 bucket now?
4    A.    Correct.
5         (Court Reporter marked
6         Defendant's Exhibit 16.)
7 BY MR. STRAND:
8    Q.    You've been shown what's been marked as
9 Exhibit 16 in this deposition.  It starts at Spangler
10 08 -- 00080 through 136.
11        And what is this document?
12    A.    Let me just look at it real quick.
13        Are you looking at the whole packet?
14    Q.    Correct?
15    A.    So this -- this was put together by
16 Fisher Design back in 2010, and this is when we did
17 our packaging refresh, I'll call it.  So this, I
18 believe, is all the kind of behind work that we did
19 with Fisher.
20    Q.    Do you know if Spangler still has
21 possession of this -- strike that.
22        It looks to me that this presentation
23 would have originally been in color.
24    A.    Yes.

Page 122

1    Q.    Do you know if Spangler still has this
2 in color?
3    A.    I'm pretty sure we do.
4    Q.    And had Spangler worked with
5 Fisher Design before this project?
6    A.    I don't know.  I think this is our
7 first -- definitely not on a large scale.  I know this
8 was our first large project with them.
9    Q.    Does Spangler still work with Fisher
10 Design today?
11    A.    Yes.
12    Q.    Does Fisher work with -- excuse me.
13        Does Spangler work with any other
14 branding or marketing companies today?
15    A.    Yes.  I mean, I think you would have to
16 be more specific.  In terms of package design?  These
17 are our main package designers, but we use some other
18 freelance people -- people to do some work for us as
19 well.
20    Q.    And Fisher Design is headed by
21 Bill Fisher?
22    A.    Yes.  I think he's one of the owners.
23    Q.    Have you spoken to him before?
24    A.    Yes.

Page 123

1    Q.    Did you speak with him in connection for
2 this case?
3    A.    No.
4    Q.    Did he provide you with the name of any
5 individuals to serve as experts in this case?
6    A.    Yes.
7    Q.    Whose name did he provide you?
8    A.    David --
9        MR. WICKLUND: Steve Uline.
10        THE WITNESS: Steve Uline.  Thank
11    you.
12 BY MR. STRAND:
13    Q.    Did you speak with Steve Uline?
14    A.    Yes.
15    Q.    When was that?
16    A.    I don't recall.  It was in -- it was in
17 regards to this.
18        And I guess I do need to clarify.  We
19 got his name through Fisher.  I don't remember having
20 a discussion with Bill over the phone.  It might have
21 been by e-mail.
22        I can't remember exactly how we got
23 Steve's name, except that it was through Fisher, and
24 it was in connection with this, trying to find

Page 124

1 somebody that, you know, was an expert in packaging.
2    Q.    Did Mr. Fisher provide you any other
3 name besides Mr. Uline?
4    A.    Not that I remember.
5    Q.    Did you speak with anyone else besides
6 Mr. Uline to try to find a -- and when I say "you," I
7 mean you personally -- with regards to trying to find
8 a packaging-design expert?
9    A.    I don't -- I don't recall.
10    Q.    What do you recall from your discussion
11 with Mr. Uline?
12    A.    Just I wanted to know just what
13 experience he had in packaging.  He clearly had a lot
14 of experience.  He had told me that he had been
15 involved in litigation in the past.  That's kind of
16 what I remember.
17    Q.    What did he tell you about his
18 experience -- strike that.
19        After your conversation, did you feel
20 confident he could serve as an expert in this case?
21    A.    Oh, yeah.  He seemed to know what he was
22 talking about.
23    Q.    What did he convey to you about his
24 experience that made you confident in his abilities?

Page 185



20    **MR. STRAND:** Don't worry.  We're
21  not going through the whole thing.
22    (Court Reporter marked
23    Defendant's Exhibit 29.)
24  **BY MR. STRAND:**

Page 186

1    Q.    I'll show you what's been marked as
2  Exhibit 29, which is Spangler 1077 through 1336.  At
3  the top it says Bill Back Detail; Date Range:
4  1-1-2017 through 9-17-2008.
5    I believe this was the Excel sheet
6  attached to 1076, the e-mail for Exhibit 28.
7    A.    Okay.

Page 187

11    **(Court Reporter marked
12    Defendant's Exhibit 30.)**
13  **BY MR. STRAND:**
14    Q.    Showing you what's marked as Exhibit 30,
15  Spangler 1352.  And at the top it says Dum-Dums Round
16  Unfilled in Non-Standard Trade Dress 2012-2018.
17    Am I correct in assuming that all the
18  images on here represent the Dum-Dums that were sold
19  that were unfilled and round in the non-standard red
20  bags?
21    A.    Yes.
22    Q.    Are there any others to your knowledge?
23    A.    **These are the big ones.  Like Color
24  Party, they're -- we have a whole -- there's multiple**

Page 188

1  **iterations of that.**
2    **This seems -- this seems to be
3  comprehensive.**
4    Q.    There's ones toward the bottom right
5  that says "50 Pops" on top, and then what are those?
6    A.    **This is a special Valentine item that we
7  have.  It's these are -- these are boxes, they're not
8  bags.  We call it a Valentine bouquet.**
9    **The reason that the "50" is on top is
10  because this particular configuration, when it sits in
11  the display case, you use the bottom of it.  So it's a
12  little different for practical reasons.**
13    **(Court Reporter marked
14    Defendant's Exhibit 31.)**
15  **BY MR. STRAND:**
16    Q.    I'm going to show you Exhibit 31, which
17  is Spangler 001378 through 1381.
18    A.    Okay.
19    Q.    And it says here in handwriting,
20  "Spangler Management Meeting Minutes, April 9,
21  2018" --
22    A.    Yes.
23    Q.    -- on the front page.
24    Are these all management meeting minutes

Page 193

1 Spangler. And then we have three outside directors,
2 Liam Killeen, Zac Isaac, and Julia Sabin.
3    Q.   Can you --
4    A.   Liam Killeen, Zac Issac, and Julia
5 Sabin.
6    Q.   Can you describe who those last three
7 individuals were or are, excuse me.
8    A.   They are -- we call them outside
9 directors. Liam Killeen works in the ice cream
10 business, has experience in the candy business.
11 Zac Isaac is an attorney here in Toledo; and Julia
12 Sabin is -- I think she's a vice president at
13 Smucker's.
14    Q.   And on page 1380 here, there is another
15 mention under 2, the first bullet point, of Dum-Dums
16 Limited Edition item.
17         Is that the same limited edition item we
18 discussed earlier?
19    A.   Yeah. I think we were talking about the
20 300 count before, so --
21    Q.   I think --
22    A.   We were expanding our -- we are
23 expanding our limited-edition line into additional
24 SKuse, which I think is what this is referring to.

Page 194

1    Q.   I just -- I think we were referring to
2 earlier about Spangler launching a limited edition bag
3 that hasn't been out yet that's -- that is comparable
4 somewhat to the Summertime bag with new flavors,
5 whatever else.
6         Is that the same --
7    A.   That's the same thing, yes.
8    Q.   Okay. And it would be the same for the
9 limited edition high-count bag?
10    A.   Yes.
11    Q.   What's the Sour Smash item?
12    A.   That's a non-round lollipop that we've
13 been -- which is new.
14    Q.   Is it sold today?
15    A.   Yes.
16    Q.   What's the DD C-store item?
17    A.   Dum-Dums convenience store item.
18    Q.   And what's MM C-store item?
19    A.   Marshmallow Circuses Peanuts convenience
20 store item.
21    Q.   And Megastick is another convenience
22 store item sold by Spangler?
23    A.   Yes.
24    Q.   Is there a particular reason why

Page 195

1 Spangler waited until mid May to sue Charms?
2    A.   Well, we just kind of found out about it
3 in -- again, I think in March was the first time we
4 saw a photo of it, and so I presented it to management
5 so --
6    Q.   And is there a reason after the suit
7 that Spangler waited until August to bring the
8 preliminary injunction motion?
9    A.   I think we were trying to do it as fast
10 as we could. I can't remember when the
11 cease-and-desist letter went out. It certainly -- I
12 want to say it was April. I mean, it was relatively
13 quickly, I think.
14    Q.   I believe this, if it refreshes your
15 recollection, 1380 says, the Spangler management
16 meeting minutes from April 23, that cease-and-desist
17 letter was sent to Tootsie.
18    A.   Okay. Yeah.
19    Q.   So around April is when it was sent.
20    A.   Yeah. So, I mean, I think we acted
21 fairly quickly once we saw -- once we saw the picture,
22 we acted, I think, very quickly.
23    Q.   Who participates in the -- regularly in
24 the management meetings?

Page 196

1    A.   The management meetings, there's about
2 nine of use, and then we have a management -- that's
3 on the second Monday of the month. That's what this
4 particular meeting is.
5         And then we have a management senior
6 staff meeting every fourth Monday of the month. And
7 that senior staff meeting, it's a management meeting
8 but it's with 30 other people, so that's the one that
9 we have roughly 40.
10    Q.   Who are the ones of the nine that attend
11 the management meeting? Who are those nine?
12    A.   It's myself and Bill and Evan Brock and
13 Denny Gunther; and Lynn Wieland in our production
14 area; and Steve Kerr in our production area; and
15 Niki Mosier, who is in our human resources; and Ryan
16 Miller, who is in logistics.
17         For the record, I think that was just
18 eight. We added Matt Dixon, but it was after this
19 meeting.
20    Q.   Okay. Did -- on 3181, it talks under
21 No. 1 about: "Providing information at the Candy Show
22 to brokers on the strength of our Dum-Dums brand and
23 the weakness of the Charms Mini brands over its many
24 years in distribution."

1  transparent windows on candy bags is relatively common
2  in order to allow consumers to see the product inside
3  the bag?
4  **A.  Yes.**
5  Q.  And you'd agree that the listing of the
6  number of lollipops in the front of a bag provides
7  information to the consumer about the number of pops.
8  It's helpful to the consumer in his or her purchasing
9  decisions.
10  **A.  Yes, particularly institutional**
11  **customers.**
12  Q.  And Dum-Dums, as we saw earlier in that
13  list of trademarks that you have, is a registered mark
14  for many goods and services, right, in many different
15  countries?
16  **A.  I'm sorry, ask me again the question.**
17  Q.  Sure.  Just the name Dum-Dums is a
18  registered trademark in the United States, right?
19  **A.  Correct.**
20  Q.  Okay.  And it's registered for many
21  different types of goods and services.  In other
22  words, I believe you -- I don't have them all here,
23  but you have it registered for candy, and you might
24  have it registered for certain clothing goods that you

1  have promotionally, et cetera.
2  **A.  Okay.  Yes.**
3  Q.  And you have it registered
4  internationally, as well.
5  **A.  Yes.  I don't know what countries.  I**
6  **know Canada is one of them.**
7  Q.  And every, all of Dum-Dums bags or
8  packaging have the term "Dum-Dums" on them -- have the
9  phrase "Dum-Dums" on it.
10  **A.  Yeah, I can't think of any that don't.**
11  Q.  Okay.  And it's usually relatively
12  prominent.
13  **A.  Yes.**
14  Q.  Has -- has Spangler ever done any
15  valuations of its marks?
16  **A.  What do you mean?**
17  Q.  You know, there's the common phrase that
18  Coca-Cola is the most valuable brand in the world, and
19  if you just bought the brand --
20  **A.  Oh, I see.**
21  Q.  -- it would be worth 3 billion dollars
22  or whatever?
23  Have you done any valuation of Dum-Dums
24  name for purposes of insurance or otherwise or

1  whatever?
2  **A.  Not that I know of.**
3  Q.  Have you ever done any valuation of the
4  alleged trade dress of the bag design?
5  **A.  No.**
6  Q.  You've never done that for purposes of
7  obtaining financing or anything?
8  **A.  No.**
9  Q.  Have you ever -- in the past six years,
10  has Spangler ever done any TV advertising for
11  Dum-Dums?
12  **A.  No.**
13  Q.  Any radio advertising?
14  **A.  No.**
15  Q.  Do you do print advertising in
16  magazines?
17  **A.  We have.  Not a lot, but some.**
18  Q.  Do you know what the term "look-for
19  advertising" is, know what it means?
20  **A.  No.**
21  Q.  Have you ever done any advertising which
22  says, Look for the red bag to find Dum-Dums, or
23  something like that?
24  **A.  I guess I'm not familiar with that.**

1  Q.  Sure.  So there's some companies out
2  there that will advertise and say, Look for this and
3  you'll know you're going to get our product.
4  Have you ever done any advertising that
5  says, Look for the red bag?
6  **A.  No.**
7  Q.  Do you have any doubt that should
8  Spangler succeed in this litigation and Tootsie Roll
9  be ordered to pay damages that Tootsie would have the
10  financial capacity to pay the damages?
11  **A.  You're asking me if -- yeah.  Tootsie's**
12  **a big -- a big company.  I don't think that they'll --**
13  **I don't think they'd have a problem paying the**
14  **damages.**
15  **Is that what you were asking?**
16  Q.  That is what I was asking.  Thank you.
17  Oh, going back to your declaration for a
18  second, which was Exhibit 9.
19  **A.  Okay.**
20  Q.  It's the one with all the tabs on it.
21  I'll grab it for you.
22  **A.  Okay.  This is 8, is that --**
23  Q.  Did I say 9?  Oh, that's 8, sorry.
24  **A.  Are you looking for 9?**

Page 205

1     Q.    No -- yeah, we are looking for 9.
2           I think we'll fix this later, because
3   I'm actually looking for Exhibit F to your
4   declaration --
5     A.    Okay.
6     Q.    -- which is here.  I believe it was
7   Exhibit 9, Exhibit F to Exhibit 9.
8           And there we're looking at the images of
9   the Charms Mini Pops on one side and the Dum-Dums on
10  the other side there, correct?
11    A.    Yes.
12    Q.    And then on the Charms bag, you'll see
13  above the 300, it says "Shop & Compare."
14          Do you see that?
15    A.    Yes.
16    Q.    What effect, if any, do you believe that
17  has on a consumer when shopping?
18    A.    I don't think much, because I don't
19  think people, for the most part, read -- read that
20  kind of small -- small print.  I think also, compare
21  to -- compare to what?
22          Mini Pops are a good value in the sense
23  that there is a lot of individual pieces, for the
24  amount of money, that you get.  So if I were a

Page 206

1   consumer, that's what I would think when I read that,
2   that, you know, they're just comparing to the overall
3   candy market.
4           But I would argue most people are not
5   going to see that.
6           MR. STRAND: There is a number
7   of documents I think we identified
8   throughout this deposition that I believe
9   exist that I'll follow up with you via a
10  letter form to see if Spangler can find
11  them.
12          We may have some kind of follow-up
13  that we can arrange, if necessary, for
14  that.  But otherwise, I have no further
15  questions.
16          MR. WICKLUND: Okay.  I have
17  nothing to add at this time.
18          MR. STRAND: Thank you.
19          MR. WICKLUND: Okay.  And we will,
20  of course, reserve.
21          THE VIDEOGRAPHER: We are now
22  going off the record.  The time is 3:25
23  p.m.  This marks the end of the
24  deposition.

Page 207

1           (Deposition concluded and witness
2   excused at 3:25 p.m.)
3           (Signature reserved.)
4           - - -

Page 208

1                SIGNATURE PAGE
2
3   Date of Deposition:  October 12, 2018
4   Correction page(s) enclosed? Yes___   No___
    How many correction pages?_____
5
6           _____
7             KIRK VASHAW       Date
8                - - -
9
10
11
12
13
14
15
16
17  Please return this signed signature page along with
                correction page(s) to:
18
19          COLLINS REPORTING SERVICE, INC.
                615 Adams Street
20              Toledo, Ohio  43604
                (419) 255-1010
21
22
23  Worksheet No. CS18-255
24

Page 209

1              C E R T I F I C A T E

2

3         I, Casey G. Schreiner, a Notary Public in and

4    for the State of Ohio, duly commissioned and

5    qualified, do hereby certify that the within-named

6    witness was by me first duly sworn to tell the truth,

7    the whole truth, and nothing but the truth in the

8    cause aforesaid; that the testimony then given was by

9    me reduced to stenotype in the presence of said

10   witness and afterwards transcribed; that the foregoing

11   is a true and correct transcription of the testimony

12   so given as aforesaid.

13         I do further certify that this deposition was

14   taken at the time and place in the foregoing caption

15   specified.

16         I do further certify that I am not a

17   relative, employee of or attorney for any of the

18   parties in this action; that I am not a relative or

19   employee of an attorney of any of the parties in this

20   action; that I am not financially interested in this

21   action, nor am I or the court reporting firm with

22   which I am affiliated under a contract as defined in

23   the applicable civil rule.

24

Page 210

1

2         IN WITNESS WHEREOF, I have hereunto set

3    my hand and affixed my seal of office at Toledo, Ohio

4    on this 19th day of October, 2018.

5

6    _____

7              CASEY G. SCHREINER, RMR-RDR
                    Notary Public
             in and for the State of Ohio

8

9    My Commission expires December 26, 2021.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    SIGNATURE PAGE

2

   Date of Deposition:  October 12, 2018
3
   Correction page(s) enclosed? Yes ✓   No___
4
   How many correction pages?____1_____
5

6          _Kirk_____  10/29/18_____
              KIRK VASHAW        Date
7

8              - - -

9

10

11

12

13

14

15

16

17  Please return this signed signature page along with
                 correction page(s) to:
18
         COLLINS REPORTING SERVICE, INC.
19              615 Adams Street
              Toledo, Ohio  43604
20              (419) 255-1010

21

22

23  Worksheet No. CS18-255

24

**CORRECTION SHEET NO. __1__ OF __1__**

**WITNESS: Kirkland B Vashaw**

**TO THE REPORTER**

I have read the entire transcript of my deposition taken on the _12th____ day of ___
October, 2018 or the same has been read to me. I request that the following changes be
entered upon the record for the reasons indicated. I have signed my name to the signature
page and authorize you to attach the same to the original transcript.


**PAGE          LINE          CORRECTION OR CHANGE AND REASON THEREFOR**

Page 75 Line 3 "The 500ct is the largest by dollar volume." (I interpreted the question this way.)


Page 100 Line 16. It should say" Total Dollars of Candy being spent" not "Dum Dums being spent"
(I simply misspoke when thinking of the definition of ACV).


Page 126 Lines 22-24 and Page 127 Line 1 The correct answer is "I don't know. The document is
Fisher's so they likely wrote the objectives in this document. I don't know how the original study
objectives were communicated to Fisher, but they would have been likely developed by Jim Knight at
Spangler." (I originally interpreted this question, "As who developed the objectives?" The actual
question related to the objectives listed in the Fisher report.)


DATE___*10/28/18*_____     SIGNATURE___*[signature]*_____