UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Spangler Candy Company,                                    Case No. 3:18-cv-1146

                    Plaintiff

          v.                                               MEMORANDUM OPINION


Tootsie Roll Industries, LLC,

                    Defendant


# I.     INTRODUCTION

Plaintiff Spangler Candy Company moved for a preliminary injunction against Defendant

Tootsie Roll Industries, LLC.  (Doc. No. 17).  In response, Tootsie opposed the injunction, (Doc.

Nos. 25 (sealed) & 26 (redacted)), and moved to exclude expert testimony and reports introduced by

Spangler in its motion for preliminary injunction.  (Doc. No. 24).  Spangler then filed a

memorandum in opposition to expert exclusion, (Doc. Nos. 39 (sealed) & 40 (redacted)), and a reply

in support of injunctive relief sought.  (Doc. Nos. 37 (sealed) & 38 (redacted)).  Following this

briefing and at the request of the parties, I held oral argument on these matters.

## II.  BACKGROUND



This litigation is centered upon the two lollipop bags pictured above.[1]  The bag on the left is manufactured by Spangler, the one on the right by Tootsie.  The undisputed facts are as follows.

In 2011, after spending 20 months and more than $220,000 in an effort to "refresh its DUM DUMS packaging," Spangler began using the packaging shown above.  (Doc. No. 17-2 at 3-4).  Since that time, DUM DUMS have been continuously sold in this packaging.  (*Id.* at 4).



In 2016, CHARMS MINI POPS, which then appeared in the packaging above, held only 0.04% of the lollipop market.  (Doc. No. 25-1 at 2).  Because Spangler had been gaining market share and was approaching that of Tootsie's, Tootsie developed a strategy in which CHARMS MINI POPS would compete with DUM DUMS.  (Doc. No. 36-8, Doc. No. 36-13).  Although the price and value competition strategy was introduced in January 2017, the idea of changing the packaging was not considered until May 2017.[2]  (Doc. No. 36-8; Doc. No. 36-12 at 23).  By July 2017, the red

---

[1] Spangler also alleges infringement of the yellow pallet boxes with a U-shaped cut out from which the lollipops are sold.  But because neither party devotes meaningful argument to this product, I will limit my analysis to the bags themselves, as well.

[2] A rebrand is mentioned in the January 2017 presentation documents, with reference to the following tactics: "easier to read graphics" and "emotional appeal vs. descriptive."  (Doc. No. 36-8

packaging first appeared in Tootsie materials, and by September 2017, the design had been approved for use.  (Doc. No. 36-3 at 4, Doc. No. 36-5, Doc. No. 36-6).  Although Tootsie enlisted the services of a third-party consultant, Cassata & Associates, to develop initial designs, none of Cassata's proposed designs were used.[3]  (Doc. No. 36-1; Doc. No. 36-12 at 17-18).  Instead, with knowledge of DUM DUMS trade dress and using no market research, Tootsie completely redesigned the package in only five months.  (Doc. No. 36-4; Doc. No. 36-12 at 31-32; Doc. No. 36-13 at 39, 41, 45-46).

Spangler learned of the new CHARMS MINI POPS packaging in March 2018 and sent a cease-and-desist letter on April 3, 2018.  (Doc. No. 25-2 at 20; Doc. No. 37-2 at 2-3).  Tootsie promptly rejected Spangler's demand on April 12, 2018.  (Doc. No. 37-2 at 4-6).  After concluding Tootsie intended wide distribution, Spangler filed suit in May 2018.  (Doc. No. 1; Doc. No. 37 at 18).

## III.  EXPERT TESTIMONY

As the trial judge, it is my duty to act as the "gatekeeper" and determine the admissibility of expert testimony.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993); Fed. R. Evid. 104(a).  This inquiry is governed in part by Rule 702, which provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

at 14).  But Tootsie's Charms Division Director of Marketing testified that the idea of changing the packaging was first considered in May 2017.  (Doc. No. 36-8 at 14; Doc. No. 36-12 at 23).  This is supported by the fact that the red Charms bag at issue does not appear in until July 2017, (Doc. No. 36-3 at 4), and further evident by the evolution of Halloween packaging introduced over the course of 2017.  (Doc. No. 36-2 at 16, Doc. No. 36-3 at 4, Doc. No. 36-4 at 16).  Finally, the proposed designs by the outside consultant are dated May or June 21, 2017.  (Doc. No. 36-1).

[3] This is somewhat odd since another Tootsie executive testified that Tootsie "depend[s] entirely on [Cassata] to come up with the design" because it has no internal employees to do so.  (Doc. No. 36-13 at 37).

Fed. R. Evid. 702.  Ultimately, an expert's testimony will be admissible if it "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.

## A.  STEVE ULINE

Tootsie moves to exclude the report of Steve Uline on grounds that it will not help the trier of fact, alleging the report states only conclusory opinions "based on no relevant data or reliable methodology."  (Doc. No. 24-1 at 15).  In part, I agree.  But because Uline has the expertise necessary to testify to the product development process through his background and experience in marketing and branding, this section of the report is admitted.  (Doc. No. 17-3 at 7-15; Doc. No. 24-6 at 12-13).  Conversely, the remainder of his report must be excluded.  (*Id.* at 5-6, 16-24).

The sections to be excluded are based upon unverified methodology and questionable sources rather than "'a reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Kumho*, 526 U.S. at 141, 149 (quoting *Daubert*, 509 U.S. at 592, 594).  First, Uline has no "specialized knowledge" of many of the topics on which he opines.  (Doc. No. 24-6 at 7, 9).  Instead, his opinion is informed by various blogs and articles he discovered through internet searches conducted in preparation of this case.  (*Id.* at 5-6).  Second, though he quotes extensively to these articles and blogs in the report and bases his opinion on them, Uline did not know many of the sources or authors and was unable to attest to their reputation.  (*Id.* at 8-14).  Finally, Uline did not verify the underlying data and methodology used to reach the conclusions upon which he relies and quotes.  (*Id.*).  Therefore, Tootsie's motion to exclude in granted in part as to Uline's testimony.

## B.  MARK KEEGAN

Like expert testimony, the admissibility of surveys is governed by the *Daubert* standard.  *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 777 (W.D. Mich. 2006).  "Because almost all surveys are subject to some sort of criticism, courts generally hold that flaws in survey methodology go to the evidentiary weight of the survey rather than its admissibility."  *Id.* at 778 (citing cases).  But "[i]f the flaws in the proposed survey are too great, the court may find that

the probative value of the survey is substantially outweighed by the prejudice, waste of time, and confusion it will cause at trial." *Id.* at 779 (quotation omitted).  Tootsie argues the *Squirt* survey[4] conducted by Spangler expert, Mark Keegan, must be excluded because the flaws are too great.

Keegan's survey, conducted through online interviewing, began with several screener questions to identify the survey population.  Tootsie challenges neither these questions nor the survey population.

After performing screener questions and receiving general instructions, respondents were shown the DUM DUMS package and instructed, "Imagine that you are shopping for candy in a store or online.  Please consider this product as you would if you encountered it while shopping for candy and are deciding whether to purchase it." (Doc. No. 18 at 47).  Although Keegan testified he was "satisfied" respondents viewed the product for a sufficient amount of time to consider the product as instructed, (Doc. No. 24-2 at 9), no evidence was produced to indicate how long respondents viewed this screen before clicking "Next" to continue.  This was the only time respondents were able to view the DUM DUMS product during the survey.  (Doc. No. 18 at 16).

Before proceeding to the likelihood-of-confusion measurement questions, respondents were directed to a screen that possessed no question but only the instruction, "Again, imagine that you are shopping for candy in a store or online.  You will now be shown several additional candy products and asked your opinions about them." (*Id.* at 48).

After clicking "Next" again, respondents performed two likelihood-of-confusion measurement questions.  Both began with an instruction to "think of the **first** candy product you saw earlier in this survey." (*Id.* at 17,19, 49, 51) (emphasis in original).  The first question asked, "For each candy product shown below, please drag and drop each product into the boxes on the right to indicate whether you believe that the product is put out by the **same company** that puts out

---

[4] This type of survey was named after the case in which it was first used.  *See Squirt Co. v. Seven- Up Co.*, 628 F.2d 1086, 1089 n.4 (8th Cir. 1980).

the first product you saw, a **different company** from the company that puts out the first product you saw, or you **don't know**." (*Id.* at 17, 49) (emphasis in original).

Respondents then proceeded to the second screen and were asked, "For each candy product shown below, please drag and drop each product into the boxes on the right to indicate whether you believe that the product is put out by a company that is **affiliated, connected, or associated** with the company that puts out the first product you saw; a company that is **not affiliated, connected, or associated** with the company that puts out the first product you saw; or you **don't know**." (*Id.* at 19, 51) (emphasis in original).



The controls pictured above were arranged vertically below each question, along with the experimental stimulus – the red CHARMS MINI POPS bag. (*Id.* at 18, 20, 49-52). Next to the column of products was the column of three boxes, which were headed with the boldfaced language of the three options for each respective question. (*Id.*). For each question, respondents were able to "click on each product to view a larger image." (*Id.* at 17,19, 49, 51). Additionally, "[t]he presentation order of the products was randomized across all respondents in each question to minimize the potential for order bias." (*Id.* at 20).

Following these two close-ended questions, the survey "concluded with several standard demographic questions regarding household income and education level, as well as a final attention filter question." (*Id.* at 21).

## 1. Controls

In support of exclusion, Tootsie first makes a two-part challenge to the controls used in the survey. Tootsie first claims Keegan should have used a "control group" rather than multiple "control products" in a sample group. But while the use of proper controls is necessary, a control *group* is not mandated.[5] In fact, the *Reference Guide on Survey Research*, cited by Tootsie, states, "Control groups and, as a second choice, control questions are the most reliable means for assessing response levels against the baseline level of error associated with a particular question." *See* Shari Seidman Diamond, *Reference Guide on Survey Research*, *in* Federal Judicial Center, Reference Manual on Scientific Evidence 359, 401 (3d ed. 2011) (attached as Doc. No. 24-3 at 47). Therefore, Keegan's choice to use controls products rather than a control group is not grounds for exclusion.

Turning to Tootsie second control-related challenge, Tootsie argues the control products chosen produced unreliable results since they resembled neither DUM DUMS nor CHARMS MINI POPS. In response, Spangler relies on Keegan's compliance with the *Reference Guide on Survey Research*, which states,

> In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.…Nor should the control stimulus share with the experimental stimulus the feature whose impact is being assessed.

Diamond, *supra*, at 399-400 (cited by Doc. No. 39 at 7). This instruction makes the task of selecting control stimuli especially difficult when many characteristics of the experimental stimulus are being assessed. *See* Jacoby, 92 Trademark Rep. at 928-29 (acknowledging the complexity of the issue of

---

[5] *See* Jacob Jacoby, Ph.D., *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, 92 Trademark Rep. 890, 894-95, 908-12 (July-August 2002) (distinguishing between "external" controls applying "between-group" design and internal controls applying "within-group" design) ("Without providing further illustrations, suffice it to say that within-group designs relying upon internal controls are often employed in trademark surveys. To recognize that this is so, all the reader need do is think of surveys that involve product (or ad) arrays."). *See also, e.g., Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561 (E.D.N.Y. 1999); *Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500 (M.D. Pa. 1998).

"how to design a 'fair' and proper control when deleting one allegedly confusing (or diluting) element would leave many others intact").

There is a fine line between finding a control which is similar enough to provide accurate results as to likelihood of confusion but not *too* similar so as to cause confusion itself. *Id.* at 931. "Strong" controls have more common features with the product at issue but are more likely to cause confusion themselves, resulting in a "conservative estimate of 'net confusion.'" *Id.* at 935-37. "Weak" controls with fewer common features have the opposite result and are "likely to yield inflated estimates of 'net' confusion." *Id.* at 932-33. Ultimately, "[p]roper controls will approximate 'background noise,' the amount of confusion existing due to reasons unrelated to similarities in trade dresses. Those controls must sufficiently account for factors legally irrelevant to the requisite confusion, so that confusion 'caused by' similarities in the trade dresses can be isolated." *Cumberland*, 32 F. Supp. 2d at 574-75.

Due in part to the complexity and arbitrariness of control choice, courts have been reluctant to exclude a survey based on inadequate controls alone. *See, e.g., Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-cv-10983, 2011 WL 6010206, at *5 (E.D. Mich. Nov. 30, 2011) (excluding a survey for "multiple flaws which resulted in an unreliable scientific foundation for its conclusions" including the use of an inadequate control); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 629-30 (S.D.N.Y. 2007) ("[W]hile the poor choice of control bag is not dispositive of inadmissibility, we note again that both Rule 702 and 403 require the court to look at the cumulative effect of all of the flaws in a survey."). Instead, applying the general rule for surveys, many courts have simply chosen to give less weight to surveys using weak controls. *See, e.g. Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 740 (S.D.N.Y. 2011) ("While such a survey may be entitled to less weight than one with closer-to-ideal controls, its relevance to the issue of association is not thereby eliminated for purposes of determining its admissibility."); *CNG Fin. Corp. v. Google, Inc.*, No. 1:06-cv-040, 2007 WL 4790787, at *2 (S.D. Ohio Aug. 24, 2007) ("Assuming Mazis did not use a proper control, this does

not warrant excluding the survey and his report from evidence pursuant to Rule 702. Google's objections regarding the selected control, as well as its remaining objections, go to the weight to be afforded the survey."). Accordingly, while the controls here are certainly flawed in that they all bear "blatantly obvious differences" to the packages at issue, the survey will not be excluded on this ground alone.

### 2. Survey Format

Tootsie next challenges the format of the survey. Specifically, Tootsie alleges use of closed-ended questions induced guessing and did not evaluate the likelihood that respondents were influenced by factors other than trade dress.[6] Close-ended questions "can be leading and suggestive," but the suggestive "effect can be mitigated through the use of a control question." *Procter & Gamble Pharm., Inc. v. Hoffmann-LaRouche Inc.*, No. 06 Civ. 0034, 2006 WL 2588002, at *23 (S.D.N.Y. Sept. 6, 2006) (citation omitted). "Control questions offer a 'don't know' or 'no opinion' type of option, as part of a set of response alternatives to a closed-ended question." *Id.* (citation omitted); *see also* Diamond, *supra*, at 390 (attached as Doc. No. 24-3 at 36) ("By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply.").

Because Keegan offered a "Don't Know/No Opinion" option for each closed-ended question, I conclude the questions were not unduly suggestive or guess-inducing. (Doc. No. 18 at 17,19, 49, 51). But since Keegan collected no information as to the respondents' rationale, which

---

[6] Tootsie makes two other allegations with respect to the format of the survey; I find merit with neither. First, Tootsie takes issue with the number of controls. Second, Tootsie finds fault in respondents having viewed the DUM DUMS package once for an unknown period of time before completing the likelihood of confusion questions. Tootsie states respondents' reliance on memory of this single instance, coupled with the numerous dissimilar controls, influenced respondents to "match a product that shared *any* resemblance." (Doc. No. 24-1 at 15). Because Tootsie provides no authority to suggest either alleged flaw would affect the weight or admissibility of the survey, I find no need to devote meaningful analysis to either. *But see* 6 McCarthy on Trademarks and Unfair Competition § 32:171 (5th. ed. 2018) (referring favorably to the "memory test").

could have been assessed in an open-ended question, whether respondents were influenced by factors other than trade-dress similarity remains unknown.

Due to the use of weak controls and failure to meaningfully assess background noise, I conclude Keegan's survey must be afforded little to no weight. Because the flaws are not so great as to warrant exclusion, Tootsie's motion to exclude Keegan's survey and report is denied.

## IV. PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To make such a showing, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). "As long as there is some likelihood of success on the merits, these factors are to be balanced, rather than tallied." *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 527 (6th Cir. 2017); *but see Winters*, 555 U.S. at 22-24 (treating these factors as quasi-elements) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.") (emphasis in original).

## A. LIKELIHOOD OF SUCCESS ON THE MERITS

To prove the first factor, Spangler must demonstrate it has "a strong likelihood of success on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citation omitted). That is, while Spangler need not "prove [its] case in full," it "must show more than a mere possibility of success." *Id.* (quoting first, *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981), and second, *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)). As such, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and

thus for more deliberate investigation." *Six Clinics*, 119 F.3d at 402 (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

In this case, Spangler asserts a claim of infringement of unregistered trade dress under section 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a)(1). "[T]o recover for trade dress infringement under § 43(a), a party must prove by a preponderance of the evidence: 1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002).

"Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale." *Id.* (brackets, ellipses, and internal quotation marks omitted). "Trade dress 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992)) (further quotation omitted). Spangler asserts Tootsie infringed upon the following elements of the DUM DUMS unregistered trade dress: (1) red bag with the brand name in white letters; (2) display window; and (3) violator consisting of a yellow oval with blue numerals.

## 1. Distinctiveness

The first element of distinctiveness is satisfied if the trade dress "*either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos*, 505 U.S. at 769 (emphasis in original).

i.      *Inherently Distinctive*

"A mark or dress can be inherently distinctive if its 'intrinsic nature serves to identify a particular source.'" *Abercrombie*, 280 F.3d at 635 (quoting *Two Pesos*, 505 U.S. at 768). Although Sixth Circuit case law is fairly developed as to the inherent distinctiveness of word marks, it provides minimal instruction in the areas of product packaging and appearance. But I find the Tenth Circuit case cited by Spangler persuasive. *See Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238 (10th Cir. 2016). Considering various circuit and district court cases as well as secondary sources, and acknowledging the Supreme Court's holding that color cannot be inherently distinctive,[7] *id.* at 1248-51, the *Forney* court held "the use of color in product packaging can be inherently distinctive … only if specific colors are used in combination with a well-defined shape, pattern, or other distinctive design." *Id.* at 1248.

Applying this holding, I conclude the Dum Dum trade dress elements at issue are not inherently distinctive. While this case is distinguishable from *Forney* since Spangler details the specific elements at issue, the elements cited are not distinctive to the DUM DUMS packaging. Many candies on the market are packaged in a red bag with white brand lettering, a display window, and a violator indicating the product count that is sometimes yellow, blue, or oval-shaped.[8] (Doc. No. 26-1). As such, the DUM DUMS trade dress is not inherently distinctive.

---

[7] *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211-12 (2000) (citing *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 162-63 (1995)) ("Indeed, with respect to at least one category of mark—colors—we have held that no mark can ever be inherently distinctive.…We held that a color could be protected as a trademark, but only upon a showing of secondary meaning.").

[8] *See* Restatement (Third) of Unfair Competition § 13 (1995) (October 2018 update) ("Commonplace symbols and designs are not inherently distinctive since their appearance on numerous products makes it unlikely that consumers will view them as distinctive of the goods or services of a particular seller. Thus, unless the symbol or design is striking, unusual, or otherwise likely to differentiate the products of a particular producer, the designation is not inherently distinctive."); *see also* 1 McCarthy on Trademarks and Unfair Competition § 8:13 (5th ed. 2018) (discussing the fact that when an element of packaging is custom within a particular industry it cannot be inherently distinctive).

*ii.    Secondary Meaning*

"A non-inherently distinctive mark or dress can have acquired distinctiveness through attachment of secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark or dress] is to identify the source of the product rather than the product itself.'" *Abercrombie*, 280 F.3d at 635 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)). To determine whether a trade dress has acquired secondary meaning, the court may consider the following seven factors:

> (1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying.

*Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 418 (6th Cir. 2006) (citation omitted). While Spangler need not prove every factor, the evidentiary burden is "substantial," requiring Spangler "show[ ] by a preponderance of the evidence that consumers view the trade dress as denoting a single thing coming from a single source." *Leapers, Inc. v. SMTS, LLC*, 879 F.3d 731, 741 (6th Cir. 2018) (citing *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 312 (6th Cir. 2001) and *DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 513 (6th Cir. 2004)) (internal quotation marks and further citation omitted).

Spangler concedes there is no consumer testimony or survey evidence available at this time in support of secondary meaning. (Doc. No. 37 at 7). Further, with respect to advertising, Spangler asserts that, while it "lacks the scale necessary for television and mass media advertising," the trade dress in itself should be considered the principle vehicle for advertising in support of this factor. (*Id.* at 9; Doc. No. 25-2 at 21). Because Spangler does not advertise in any way other than by placing its product on a shelf, this factor need not be considered, either. Therefore, four factors remain.

The amount-of-sales and established-place-in-the-market factors weigh in Spangler's favor, since DUM DUMS is "the best-selling lollipop brand in the United States, with significant sales" and strong brand loyalty. (Doc. No. 37 at 9; Doc. No. 25-3 at 2; Doc. No. 25-4 at 12).

Regarding the exclusivity, length, and manner of use, Spangler concedes that it has been using this specific packaging only since 2011 but asserts it "has used red packaging and many of the same graphic elements to market and sell DUM DUMS® for over 23 years." (Doc. No. 17-1 at 13). Tootsie does not dispute this but contends Spangler has not had *exclusive* use of this trade dress since that time, pointing to the numerous candies packaged in red bags with windows and violators.[9] (Doc. No. 26-1). To rebut Tootsie's argument and prove this factor, Spangler states that while other candy bags possess some of the same elements, the combination of these elements is exclusive to the DUM DUMS trade dress. This is true. But due to the similarities between the DUM DUMS bag and others on the market, I find that though this factor weighs in favor of Spangler due to its length of use[10] and possible exclusivity, it must be given little weight.

Finally, to prove intentional copying, Spangler points to the obvious resemblance between the new CHARMS MINI POPS bag and the DUM DUMS bag. (Doc. No. 17-1 at 15). Tootsie offers little in the way of rebuttal, other than to conflate intent to copy with intent to deceive. (Doc. No. 25 at 22). But, as Spangler correctly notes, the intent to *copy* is distinguishable from the intent to

---

[9] This argument by Tootsie is the only one in which I find possible merit. Briefly, as noted by Spangler, Tootsie misplaces its reliance on *Ward v. Knox Cnty. Bd. of Educ.*, 612 F. App'x 269 (6th Cir. 2015). Although Tootsie is correct in its assertion that the court ultimately found the mark in question had not acquired a secondary meaning, the court noted that the "exclusivity, length, and manner of use" factor weighed in the plaintiff's favor because plaintiff had been using the mark "exclusively and consistently for approximately 20 years." 612 F. App'x at 273. Accordingly, if *Ward* is relevant here, it would support Spangler's position, not Tootsie's.
Further, I reject Tootsie's argument that all DUM DUMS packaging must possess the same trade dress. The DUM DUMS bags submitted in support of Tootsie's position appear to be promotional or seasonal packaging, rather than the general packaging. Were this rule to prevent trade dress protection based on the use of seasonal promotions alone, a great many products, including CHARMS MINI POPS, (Doc. No. 36-12 at 51-52), would lose protectable trade dress rights.
[10] At the time Tootsie developed the new CHARMS MINI POPS packaging in July 2017, Spangler had been consistently using the packaging in question for approximately six years. Using section 2 of the Lanham Act as guidance, I find six years sufficient to support this factor. *See* 15 U.S.C. § 1052 ("The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made.").

*deceive*; secondary meaning requires intent to copy alone. (Doc. No. 37 at 10 (citing *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 514 (6th Cir. 2013))).

Here, Tootsie's Charms Division Director of Marketing testified Tootsie's intent in the redesign was to develop a bag that was better than its primary competitor – DUM DUMS – and ultimately obtain market share at the expense of DUM DUMS. (Doc. No. 36-12 at 21, 28-30; *see also* Doc. Nos. 36-2, 36-3, 36-4, Doc. No. 36-13 at 20, 22-23). Without market research and with full knowledge of the appearance of the DUM DUMS bag, Tootsie chose a package with elements that were nearly identical to that of the DUM DUMS bag. (Doc. No. 36-4; Doc. No. 36-12 at 31-32; Doc. No. 36-13 at 39, 41, 45-46). Tootsie specifically recognized the similarity between the violators' color scheme, had multiple other options, and chose to proceed with the similar design anyway. (Doc. No. 25-1 at 5; Doc. No. 36-13 at 46-47, 61-62). Because Tootsie performed no market research to advise the rebranding strategy and recognized the similarity between the two packages when targeting DUM DUMS' market share, I conclude there is sufficient circumstantial evidence to find Tootsie acted with the intent to copy.

Balancing the factors, I conclude the amount-of-sales and established-place-in-the-market weigh strongly in Spangler's favor. Further, Tootsie intended, at least in part, to copy Spangler's long-used DUM DUMS trade dress. Therefore, I conclude there is sufficient evidence to support a finding of secondary meaning.

## 2. Functionality

In civil actions for infringement of unregistered trade dress, "the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3). Accordingly, to satisfy this element, Spangler "must show that its design feature is not 'essential to the use or purpose of the article' and that it does not 'affect[ ] the cost or quality of the article.'" *Leapers*, 879 F.3d at 736 (quoting *Inwood*, 456 U.S. at 850 n.10); *see also TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001).

But with respect to aesthetic functionality, as is the case here, the burden is "not substantial," *Leapers*, 879 F.3d at 737, requiring only a showing that the "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex*, 514 U.S. at 165. In other words, "[a] design has aesthetic functionality when it communicates the use, purpose, cost, or quality of the product in a way that competitors cannot avoid replicating without incurring costs 'not to copy but to design around.'" *Leapers*, 879 F.3d at 737 (quoting *Abercrombie*, 280 F.3d at 643) (further citation omitted).

The design features at issue here are: (1) a red bag with the brand in white lettering; (2) a display window in the bag showing suckers within; and (3) a blue and yellow violator indicating the number of lollipops within the bag. None of these three things are essential to packaging or selling lollipops. While the color red may serve a purpose, it is not the only color which may be used to communicate that the package contains lollipops. The same applies to the violator, which could accurately communicate the number of lollipops within the bag in any color. Finally, the window in the bag might serve the purpose of communicating what is contained therein. But the same purpose can be accomplished through other means such as labeling the bag, as evident by the numerous candy bags that do not possess the window. Therefore, because none of these design elements are essential to the packaging or sale of lollipops, I conclude the trade dress is not functional.

### 3. Likelihood of Confusion

The final element asks whether there is "a likelihood of confusion as to the source or origin of the plaintiff's and defendant's products." *Abercrombie*, 280 F.3d at 645. Thus, the "ultimate question" is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Groeneveld*, 730 F.3d at 509 (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)) (further citation omitted). The following eight factors may aid in this determination:

> 1) strength of the plaintiff's mark, 2) relatedness of the goods, 3) similarity of the marks, 4) evidence of actual confusion, 5) marketing channels used, 6) likely degree

of purchaser care, 7) defendant's intent in selecting the mark, and 8) likelihood of expansion of the product lines.

*Abercrombie*, 280 F.3d at 646 (citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)) (further citation omitted).

Three of these factors are not in dispute. Tootsie concedes the following factors weigh in Spangler's favor: "relatedness of the goods" and "marketing channels used." (Doc. No. 25 at 23). Further, both parties agree that the "likelihood of expansion of the product lines" is not relevant here. As such, five factors remain.

   i.      *Strength*

"The strength of [trade dress] is a determination of the [trade dress]'s distinctiveness and degree of recognition in the marketplace." *Gray v. Meijer, Inc.*, 295 F.3d 641, 646 (6th Cir. 2002). As such, the inquiry depends on: (1) "the uniqueness of the trade dress" and (2) "the investment in imbuing a trade dress with secondary meaning." *Id.* at 647; *see also Daddy's*, 109 F.3d at 280 ("A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both.") (internal quotation marks omitted).

Considering the numerous other red bags with similar features in the marketplace of candy,[11] the Dum Dums trade dress is not "unique." (Doc. No. 26-1). Further, as discussed above, while Dum Dums leads the lollipop marketplace, Spangler does not advertise or otherwise promote the product, an act which would "infuse" the trade dress with meaning. *See Gray*, 395 F.3d at 647 ("[T]he most mundane packaging may be infused with meaning by advertising and other

---

[11] The CEO of Dum Dums indicated Dum Dums competes with all candy, including chocolate, but testified to competing "more in the non-chocolate space." (Doc. No. 25-2 at 11). Accordingly, even if Dum Dums was the only red bag on the lollipop market, which it is not, the uniqueness of the Dum Dums trade dress must be measured against other candy as well.

promotional tools, rendering a strong trade dress."). Therefore, combining both factors, I find the
Dum Dums trade dress as defined here to be rather weak.[12]

  *ii. Similarity*

  "In assessing similarity, 'courts must determine whether a given mark would confuse the
public when viewed *alone*, in order to account for the possibility that sufficiently similar marks may
confuse consumers who do not have both marks before them but who may have a general, vague, or
even hazy, impression or recollection of the other party's mark.'" *Maker's Mark Distillery, Inc. v.
Diageo N. Am., Inc.*, 679 F.3d 410, 421 (6th Cir. 2012) (quoting *Daddy's*, 109 F.3d at 283) (emphasis
added).

  Like the defendant in *Maker's Mark*, Tootsie relies substantially on the argument that the two
are distinguishable because of the prominence of the brand name, regardless of the resemblance.
More specifically, the "Charms" house mark[13] occupies a third of the Charms Mini Pops bag.

  "[T]he presence of a house mark can decrease the likelihood of confusion" and is "a factor
to be considered in the evaluation of similarity." *Maker's Mark*, 679 F.3d at 422 (citing *AutoZone, Inc.
v. Tandy Corp.*, 373 F.3d 786, 796-97 (6th Cir. 2004)). The significance of a "house mark" is greater
in this type of "palming off" case than one of association amongst related products where "one
might associate with or sponsor the other and still use their own house mark." *Id.* The house mark
is especially significant in reducing likelihood of confusion "when one mark…is so easily
recognizable and associated with a strong and popular brand." *Progressive Distrib. Servs., Inc. v. United*

---

[12] This conclusion is supported by Spangler's expert, Mr. Keegan. Keegan testified that he did not
believe an *Eveready* survey was appropriate in this case even though he agreed that this type of survey
is considered to be "the gold standard in cases involving strong marks." (Doc. No. 24-2 at 9).
Instead, Keegan decided to perform a *Squirt* survey, which he has referred to as "the savior of weak
marks," used when a mark has no "fame." (Doc. No. 24-5 at 20, 23).

[13] A "house mark" is a "product label[ ] identifying the name of the manufacturer." *Maker's Mark*,
679 F.3d at 422; *see also* 4 McCarthy on Trademarks and Unfair Competition § 23:43 (5th ed. 2018)
("A 'house mark' is a mark used on several different goods or services which themselves use a
particular 'product mark.'"). Because Charms has been a leading lollipop manufacturer for over 100
years (Doc. No. 25-1 at 2), "Charms," as it appears on the bag here, is treated as the house mark for
purposes of this analysis even though Tootsie is the overhead manufacturer.

*Parcel Serv., Inc.*, 856 F.3d 416, 433 (6th Cir. 2017); *see also* 1 McCarthy on Trademarks and Unfair Competition § 8:16 (5th ed. 2018); 4 McCarthy on Trademarks and Unfair Competition § 23:53 (5th ed. 2018).

While the appearance of the two bags are undoubtedly similar when viewed side-by-side, that is not the question here. *See Progressive*, 856 F.3d at 432 ("In evaluating whether the mark is similar, a court should not examine the marks side by side[.]"). Instead, viewing the CHARMS MINI POPS bag alone, it is clear from the prominent display of the recognizable "CHARMS" house mark that the two bags are sufficiently dissimilar. Even if the resemblance incites some association with DUM DUMS, the CHARMS house mark strongly reduces the likelihood of confusion for purposes of this factor.

### iii.     *Evidence of Actual Confusion*

There is no dispute that there have yet to be any actual complaints of confusion. (Doc. No. 25-2 at 8). Instead, to prove actual confusion, Spangler submits as evidence the *Squirt* survey conducted by Keegan. But as discussed above, this survey is afforded little weight due to the methodological errors. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518 (6th Cir. 2007). Therefore, Spangler is unable to show any actual confusion. [14]

### iv.     *Likely Degree of Purchaser Care*

As acknowledged by Tootsie, there is a "general proposition that the average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible

---

[14] Tootsie introduces two surveys to evince lack of actual confusion. Spangler challenges the methodology of these surveys. While the merit of these challenges and an analysis of the weight due to these surveys may be necessary later in this litigation, I do not find it material at this time. Even if this factor does weigh in Tootsie's favor, it is not dispositive to the likelihood-of-confusion element. *See Wynn Oil v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988) ("In a case where there was no evidence of actual confusion, the Court of Appeals for the Federal Circuit correctly reasoned that 'this fact does not preclude this Court from concluding that there is a "likelihood of confusion", as actual confusion is merely one factor to be considered by the Court when it makes its determination.' Further, because evidence of actual confusion is difficult to produce and frequently discounted as unclear or insubstantial, 'this factor is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available.'") (quoting *Bandag, Inc. v. Al Bolster's Tire Stores, Inc.*, 750 F.2d 903, 914 (Fed. Cir. 1984)).

products, such as snack food." *Gray*, 295 F.3d at 649-50 (citing cases). Further, "courts have found that the relative locations of the competing products on store shelves are significant." *Id.* at 650. In this case, Tootsie acknowledges that it "expects to co-exist with DUM DUMS, side-by-side on store shelves." (Doc. No. 25-1 at 6; Doc. No. 36-13 at 49-50). Accordingly, applying the logic articulated in *Gray*, due to the anticipated proximity on shelves coupled with the fact that lollipop buyers are unlikely to exercise a high degree of care with selection, this factor weighs strongly in Spangler's favor.

    *v.*     *Tootsie Roll's Intent*

Unlike secondary meaning, the "intent to copy" "standing alone has no bearing on the likelihood-of-confusion issue" in a trade dress action. *Groeneveld*, 730 F.3d at 514. Instead, the question is whether Tootsie acted with "intent to *deceive* or *confuse*." *Id.* (citing cases). But "[c]ircumstantial evidence of copying, particularly the use of a contested mark with knowledge that the mark is protected, may be sufficient to support an inference of intentional infringement where direct evidence is not available." *Progressive*, 856 F.3d at 436.

Tootsie does not dispute the fact that it knew of DUM DUMS trade dress when designing the new CHARMS MINI POPS packaging. But "knowledge of a trademark, alone, will not support a finding of intent to confuse if other circumstances show that the defendant believed there was no infringement." *Progressive*, 856 F.3d at 436 (citing *AutoZone*, 373 F.3d at 800). That is not the case here.

Unlike the junior users in *Progressive* and *AutoZone*, whose appearances were different than the senior user,[15] Tootsie not only recognized the similarity in the violators' color scheme and proceeded to use the design anyway, but also acted with the intent that the two bags sit side-by-side in the

---

[15] *See Progressive*, 856 F.3d at 436 ("[Junior user] did not believe such prior use would result in a likelihood of confusion because many companies used similar marks and because the products appear substantially different."); *AutoZone*, 373 F.3d at 800 ("it believed that there was no infringement given the dissimilarity of the marks and the unrelatedness of the products offered by each company.").

market place.  (Doc. No. 25-1 at 5-6; Doc. No. 36-13 at 46-47, 49-50, 61-62).  While Tootsie Roll alleges the "Shop & Compare" violator along with the CHARMS name evinces an intent to compete rather than deceive,[16] I do not agree.  Tootsie admits its consumers spend merely seconds picking out the package, basing the decision on recognition, possibly without even reading the package. (Doc. No. 36-13 at 48-49).  Further, Tootsie made no attempt to introduce the same competitive pricing scheme with the old yellow package before investing nearly $1 million in the packaging redesign and the new product launch.  (Doc. No. 25-1 at 6; Doc. No. 36-13 at 55, 59, 62).  Finally, the product redesign process used by Tootsie did not consist of market research and was complete in a quarter of the time Spangler used to redesign the DUM DUMS trade dress years prior.  (Doc. No. 17-2 at 3-4; Doc. No. 36-4; Doc. No. 36-12 at 31-32; Doc. No. 36-13 at 39, 41, 45-46).

Considering all of these facts, I conclude the circumstantial evidence suggests Tootsie emulated the DUM DUMS trade dress with the intent of diverting business from DUM DUMS through the similar design.  *See Daddy's*, 109 F.3d at 286 ("[P]urposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user.").

*vi.     Balancing Factors*

The DUM DUMS trade dress is not strong and there is no evidence of actual confusion.  But the two companies used the same marketing channels to sell the same product.  While the CHARMS

---

[16] Tootsie Roll relies on *Groeneveld* for this procompetitive argument.  But *Groeneveld* is easily distinguishable from the case at hand.  First, the court found the product design trade dress at issue in the case to be functional.  730 F.3d 504-09.  Second, finding the functional product *design* had not been copied with the intent to deceive, *Groeneveld* relied upon the procompetitive interests served by giving consumers an alternative option which presumably operated in the same manner as the original but was simply offered by a different manufacturer.  *Id.* at 511-16; *see also* 1 McCarthy § 8.5 (distinguishing "product design" from traditional trade dress).  Here, the trade dress at issue is not functional product *design* but a nonfunction product *packaging*.  Thus, in providing an alternative in the marketplace, the trade dress alone would not serve the same procompetitive purpose of alerting the consumer that the product operated in the same manner.  As such, this case appears to be more of a "masquerade" *Groeneveld* cautioned against than an attempt to "us[e] a functional product's look to promote a competitive offering."  730 F.3d at 514-15.

MINI POPS trade dress is distinguishable when seen alone, Tootsie intends the product to be sold side-by-side on the shelf with DUM DUMS, which would increase the likelihood of confusion due to the low degree of purchaser care. This intent along with other evidence also supports a conclusion that Tootsie acted with the intent to deceive. Therefore, considering all the factors, I find the evidence suggests the red CHARMS MINI POPS packaging is confusingly similar to the DUM DUMS trade dress.

### 4. Conclusion

Because a jury could reasonably conclude that Spangler has proven all elements of this claim with the limited evidence available at this early stage in the litigation, "the merits present a sufficiently serious question to justify further investigation." *In re DeLorean*, 755 F.2d at 1230. Therefore, Spangler has proven success on the merits is not merely possible, but likely.

### B.    IRREPARABLE HARM

The second factor of the preliminary injunction standard requires the plaintiff show irreparable harm is not merely *possible*, but *likely* in the absence of preliminary injunction. *Winter*, 555 U.S. at 22. Harm is irreparable "if it is not fully compensable by monetary damages" or "if the nature of the plaintiff's loss would make the damages difficult to calculate." *Certified Restoration*, 511 F.3d at 550 (quoting first, *Overstreet v. Lexington-Fayette Union Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002), and second, *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).

Generally, "in the context of an infringement action, a finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears [because] irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values." *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) (internal quotation marks and brackets omitted). Because Spangler has established a

likelihood of confusion, a finding of irreparable harm would generally follow.[17]  But as Tootsie Roll argues, when asked to "[s]tate the facts supporting or substantiating Plaintiff's allegation that is has been damaged by Tootsie's use of the accused packaging for its CHARMS MINI POPS product," Spangler identified three sources of "known or possible damages" and provided a method of calculating the monetary value of each.  (Doc. No. 25 at 33; Doc. No. 25-5 at 5-6).  Spangler fails to refute, or so much as acknowledge, this argument but continues to argue it will suffer irreparable harm if Tootsie continues to trade on its goodwill and reputation.  (Doc. No. 37 at 18-20).

Since Spangler identified a method of calculating the monetary value of the damages sought, it is arguable that the policy interests secured by the presumption are not at stake here.  But Spangler is correct in stating the loss of control of its reputation by allowing Tootsie to sell the same product in the confusingly similar bag would cause irreparable harm since "loss of control over one's reputation is neither calculable nor precisely compensable."  *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 596 (6th Cir. 2015) (internal quotation marks omitted); *see also Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 756 (S.D. Ohio 2010) ("The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another.'") (quoting *Processed Plastic Co. v. Warner Commc'n., Inc.*, 675 F.2d 852, 858 (7th Cir. 1982)) (further citation omitted). Accordingly, the damage to Spangler's reputation and goodwill by allowing Tootsie to continue selling the CHARMS MINI POPS in the red package is irreparable.

---

[17] Following *Wynn Oil II* which found a two-year delay did not preclude injunctive relief, I find Spangler's months-long delay does not preclude injunctive relief either.  *See* 943 F.2d at 607-08. Tootsie has not put forth a convincing argument to persuade me otherwise.

## C.    BALANCE OF EQUITIES

When considering the third factor, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)).

In this case, Tootsie alleges a preliminary injunction would cause it substantial harm.  (Doc. No. 25-1 at 6-7).  First, Tootsie has already invested $1 million in the product redesign and launch and would have to invest more money and time into a second redesign.  Second, Tootsie claims a second redesign so soon after the first could damage the company's image as a whole.  Spangler challenges the legitimacy of these claims, stating that since CHARMS MINI POPS are already sold in a different package at Wal-Mart, the cost would not be as great as Tootsie alleges.  (Doc. No. 37 at 21).  I agree.

Tootsie has already designed and is using an alternative bag for one of its three nationwide distributors.  (Doc. No. 36-12 at 40, 50-51; Doc. No. 36-13 at 34-35, 59-60).  Therefore, while Tootsie may experience some hardship in repackaging the existing inventory into the white Wal-Mart bags, it would not be burdened with a complete redesign.  Because Tootsie's burden in transferring inventory to an existing package is substantially less than Spangler's loss of goodwill and reputation, this factor weighs in Spangler's favor.

## D.    PUBLIC INTEREST

The final factor reviews the public interest at stake in granting the injunction.  Spangler alleges a preliminary injunction will halt customer confusion in the marketplace.  Tootsie claims the injunction would have a chilling effect on competition.  After considering both arguments, I agree with Spangler.  As stated above, I do not find merit in Tootsie procompetitive argument in this case of aesthetic packaging trade dress infringement.  Competition is not threatened if Tootsie continues to offer CHARMS MINI POPS at the same competitive pricing in the already-existing alternative packaging.  Therefore, this final factor weighs in Spangler's favor.

## V.    CONCLUSION

Because all factors discussed above weigh in Spangler's favor, Spangler's motion for preliminary injunctive relief is granted.  Additionally, for the reasons stated above, Tootsie's motion to exclude expert testimony is granted in part and denied in part.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge